UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAUNA M. MOTE, DEBORAH CLARK,
CARLOS GRAY-LION, BRENDA BARANIAK,
KAREN STREET, MERLYN STREET,
LEE BENTON, by his next friends RONALD M.
BENTON and MARION BENTON, J.N., a minor,     Case Number 16-11546
by his next friends DANIEL and MARY JANE     Honorable David M. Lawson
NELSON, ANN ARBOR CENTER FOR
INDEPENDENT LIVING, INC., and
JENNIFER KUNDAK,

          Plaintiffs,

v.

CITY OF CHELSEA, CHELSEA DOWNTOWN
DEVELOPMENT AUTHORITY, and MICHIGAN
DEPARTMENT OF TRANSPORTATION,

          Defendants,

and

CITY OF CHELSEA,

          Third-party plaintiff,

v.

WASHTENAW COUNTY ROAD COMMISSION,

          Third-party defendant.
_____/

## OPINION AND ORDER DENYING MOTIONS FOR JUDGMENT ON THE PLEADINGS, AND GRANTING PLAINTIFFS' MOTION TO AMEND THE COMPLAINT AND JOINT MOTION TO APPROVE THE CONSENT DECREE

This case concerns the sidewalks, curbs, and intersections in the City of Chelsea, Michigan,

and their accessibility to persons with disabilities. The plaintiffs — Shauna Mote and several other

disabled individuals, joined by the Ann Arbor Center for Independent Living — filed this lawsuit

under the Americans With Disabilities Act (ADA) alleging that the City of Chelsea and its

Downtown Development Authority (DDA), along with the Michigan Department of Transportation (MDOT), have created or facilitated violations of the ADA within certain public pedestrian areas in the City by allowing businesses to renovate storefronts without including appropriate accessibility measures, and by removing previously constructed physical accommodations for wheelchair users, such as curb ramps at some intersections.

The plaintiffs initially sued the public entities they believed have jurisdiction over the facilities in question. Chelsea obtained leave to file a third-party complaint against the Washtenaw County Road Commission (WCRC), alleging that the responsibility for regulating and maintaining one of the main roadways through the City ("Old U.S. Highway 12"), which is the locale of certain alleged accessibility defects described in the complaint, rests entirely with that agency and is beyond the purview of the City or its zoning authorities. In the meantime, the plaintiffs and Chelsea and its DDA have reached a settlement, which they have presented as a proposed consent decree. The MDOT takes no position on that request, but the WCRC opposes it.

Presently before the Court are motions (1) for judgment on the pleadings by defendant MDOT; (2) for judgment on the pleadings by third-party defendant WCRC; (3) for entry of a consent decree filed jointly by the plaintiffs and defendants City of Chelsea; and (4) for leave to file a second amended complaint by the plaintiffs that would add the WCRC as a principal defendant and elaborate claims directly against that entity premised on the same facts alleged in the original complaint concerning certain roadways within the City of Chelsea. The Court heard argument on January 5, 2017. The pleadings state plausible claims against all of the public entities under Title II of the ADA and the Rehabilitation Act of 1973. Bringing the WCRC into the dispute as a main defendant clarifies the issues, properly aligns the parties, and will not prejudice anyone. There is

no good reason not to allow the settlement between Chelsea and the plaintiffs. Therefore, the Court will deny the motions for judgment on the pleadings, grant the motion to approve the settlement, and grant the plaintiffs' motion to file a second amended complaint. Because of the delay in ruling on these motions, the Court will entertain the parties' proposals to adjust the present scheduling order.

## I.

According to the first amended complaint, the individual plaintiffs are disabled persons, who live, work, or frequently travel to and within the City of Chelsea, Michigan, and who each require the use of a wheelchair, braces, cane, or other assistive devices in order to get around. Plaintiff Ann Arbor Center for Independent Living is an association that represents disabled persons such as the plaintiffs throughout southeastern Michigan, including in Chelsea. Together, and on behalf of persons similarly situated, the individual and association plaintiffs complain that the public streets and sidewalks in the City of Chelsea recently have become less than fully accessible to them due to City approvals of renovations by private businesses adjacent to public sidewalks and streets making those facilities inaccessible, and because of construction and renovation work done on public sidewalks and streets by the City of Chelsea, the WCRC, and MDOT, which either removed or omitted accessibility features. In particular, the plaintiffs claim that the City has allowed businesses to renovate their storefronts by installing new steps that create barriers to access for wheelchair users, where ramps previously allowed them to enter those businesses, and that the City (or other defendant agencies) have removed existing ramps and curb cuts and replaced them with grass or solid curbs at certain intersections.

The plaintiffs assert that all of the accessibility defects of which they complain are located within the City of Chelsea, and that many of the alleged violations concern the public streets and sidewalks along Michigan State Route 52 (which, within the City limits, is also known as "Main Street" and is the principal auto and pedestrian route through the city center). They charge that the alleged "defective construction and alterations, combined with insufficient maintenance and enforcement — have continuously failed to ensure that [the defendants'] sidewalks, street crossings, street level transit stops, and certain other facilities, services, programs and activities are readily usable by and accessible to Plaintiffs and others."

Plaintiff Deborah Clark uses a wheelchair and the aid of a service dog. She recently moved to Chelsea and discovered that she could not safely access the City's sidewalks, street crossings, and municipal parking. Also, she found that many downtown businesses lack an accessible entrance, and even the public library is inaccessible to her. She also cannot safely use many sidewalks and street crossings due to accessibility barriers.

Plaintiff Shauna Mote recently tried to use the City's new Jackson Street parking lot, which was built in 2014, but she was unable to do so because the driveway and walkways connecting the lot to Middle Street are too steep for her safely to traverse.

Plaintiffs Carlos Gray-Lion and Karen and Merlyn Street recently learned that the City removed long existing curb cuts that they had used on Congdon Street and Wilkinson street, and replaced them with inaccessible grassy areas or solid curbs.

Each year the City and its DDA sponsor several festivals and parades. The individual plaintiffs all have been unable to attend or fully participate in these events due to the lack of accessible public parking, as well as mobility barriers on City sidewalks and streets.

The MDOT has principal responsibility for maintaining the M-52 roadway, including the portion that comprises Main Street in the City, but it permits the City to do certain work on adjacent sidewalks and curbs. At various times after January 16, 1992 (the effective date of the applicable version of the ADA Accessibility Guidelines), MDOT has performed maintenance and new construction in the M-52 corridor, including re-paving the roadway from curb line to curb line and constructing or repairing sidewalks and curbs. Despite these renovations and new construction projects, MDOT has left in place a number of inaccessible curbs at pedestrian crosswalks. MDOT also has permitted the City to construct or alter adjacent sidewalks and curbs along Main Street, which suffer similar accessibility defects. MDOT also allows on-street parking along Main Street, and has striped parking spaces for that purpose. According to the first amended complaint, none of that parking is ADA-compliant because it is obstructed by, among other things, excessive slopes or obstructive lips between the street and sidewalks, as well as holes and other defects in the pavement or curb ramps.

In 2015 the City re-paved Congdon street and, in the process, removed two curb cuts at the pedestrian cross-walk at the intersection with Lincoln Avenue. The City also stopped its resurfacing project just short of an intersection with Middle Street, in order to avoid doing work that would have required the City to install curb cuts at cross-walks there.

Also in 2015, MDOT awarded the City a "Safe Route to Schools" grant (which included federal funds) to improve accessibility and safety in several public pedestrian corridors within the City. However, in addition to using those funds to build new cross-walks and signals, and to create some accessible curb ramps, the City also spent some of the money to remove other, long-existing curb cuts and ramps, replacing them with inaccessible features.

In 2014 the City constructed and opened its Jackson Street parking lot, which included a driveway and walkway connecting the public parking areas to the street. The parking facility, however, is inaccessible due to extreme slopes in the driveway and walkway.

Finally, since 1992, the City has maintained a number of public municipal parking lots and spaces for on-street parking along various city streets. The City has added or altered many of those municipal parking lots and on-street parking spaces that include spots designated as parking for wheelchair users. However, all of the designated spaces are inaccessible for various reasons, including excessive slopes, insufficient width per the ADA guidelines, and lack of adequate or level space to deploy a vehicle wheelchair ramp.

In its third-party complaint, the City alleges that it is bisected by two main roadways that are not fully under its control and regulation. As previously noted, one of the streets is M-52 ("Main Street"), which the City contends is maintained and regulated by MDOT. The City alleges that the other major bisecting roadway is County Road Old U.S. 12, which is subject to the exclusive jurisdiction and control of the WCRC. The City admits that it constructed two pedestrian crossings on Old U.S. 12 since 1992, and it asserts that it did so with a permit from the County. But the City contends that, to the extent that the plaintiffs complain of any other defects involving sidewalks or pedestrian cross-walks along the Old U.S. 12 corridor, any declaratory or injunctive relief obtained must be directed to the WCRC, because it has — and has exercised — exclusive control over the conditions and construction of the street, sidewalks, curbs, and crossings along that route.

The plaintiffs' initial putative class-action complaint and related responses and orders were struck because those documents improperly included the full name of an individual plaintiff who is a minor. The plaintiffs subsequently re-filed a corrected amended complaint naming that

individual only by his initials. The amended complaint alleges violations of ADA Title II (Count I) and the Rehabilitation Act of 1973 (Count II) against the City of Chelsea, the City's Downtown Development Authority, and MDOT. The complaint also raises a congruent claim against the City of Chelsea only under Michigan's Persons With Disabilities Civil Rights Act (PWDCRA). The City of Chelsea sought leave to file a third-party complaint against the WCRC, which the City contends has exclusive control over and responsibility for certain roadways within its city limits. Defendant MDOT filed an answer to the original complaint and a motion for judgment on the pleadings; WCRC responded in similar fashion to the third-party complaint. The plaintiffs later filed a joint motion for entry of consent decree with the concurrence of the City of Chelsea, and a motion for leave to file a second amended complaint to name WCRC as a principal defendant.

## II.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) applies the same standards that govern motions to dismiss filed under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001). The standards are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief

that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility

requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement

to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d

278, 280 (6th Cir. 2010).

At this stage of the case, the Court must accept as true the pleaded facts, but not factual

conclusions unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as

those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can

provide context to the factual allegations, but are insufficient to state a claim for relief and must be

disregarded. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555). However, as long as a

court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,'

a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556

U.S. at 678).

### A.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

12132. "'Public entity' includes 'any state or local government' and 'any department, agency,

special purpose district, or other instrumentality of a State or States or local government.'" *Ability

Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004) (quoting 42 U.S.C.

§ 12131(1)(A) & (B)). "[Section 204 of the] Act grants the Attorney General authority to

promulgate regulations to implement its provisions." *Ibid.* (citing 42 U.S.C. § 12134). "Pursuant

to § 204, the Attorney General adopted 28 C.F.R. § 35.151, which provides that alterations of

facilities commenced after January 26, 1992, 'by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities.'" *Ibid.* (quoting 28 C.F.R. § 35.151(b)). The term "facility" is defined under the applicable ADA regulations to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104.

"To be 'readily accessible,' any part of a newly constructed or altered facility must be constructed in conformance with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, or with the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. Pt. 101-19.6, App. A." *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 986 (9th Cir. 2014) (citing 28 C.F.R. § 35.151(c)(1)-(3)). "The ADAAG is a comprehensive set of structural guidelines that articulates detailed design requirements to accommodate persons with disabilities." *Ibid.* "Section 35.151 is part of a broader regulatory scheme that aims to effectuate § 202 of the ADA." *Ability Center*, 385 F.3d at 904. "The scheme makes explicit that 'no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.'" *Ibid.* (quoting 28 C.F.R. § 35.149).

Section 504 of the Rehabilitation Act of 1973 states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "[T]he remedies, procedures, and rights available under Title II of the ADA parallel those available under [The Rehabilitation Act]." *Ability Center*, 385 F.3d at 905 & n.7 (citing 29 U.S.C. 794a(a)(2); *Barnes v. Gorman*, 536 U.S. 181, 189 n.3 (2002); *Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998)). Thus, the Sixth Circuit has explained that its "analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are 'quite similar in purpose and scope.'" *Babcock*, 812 F.3d at 540 (quoting *McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453, 459-60 (6th Cir. 1997)).

The same can be said of the Michigan Persons With Disabilities Civil Rights Act (PWDCRA). It "'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'" *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)).

The motions by MDOC and WCRC are based primarily on their reading of *Babcock v. Michigan*, 812 F.3d 531 (6th Cir. 2016). That case concerned the accessibility by disabled people to Cadillac Place, the former General Motors Corporation world headquarters building that the State of Michigan acquired to be used as offices for several state agencies. The building, designed by the renowned architect Albert Kahn, was constructed between 1919 and 1923. The plaintiff in that case was an employee of one of the state agencies, and she alleged that certain design features of the building violated Title II of the ADA because they denied her access to her place of employment. *Id.* at 533. The court held that the plaintiff failed to state a claim under the ADA, because she

"failed to identify any 'services, programs, or activities' of a public entity from which she was excluded or denied a benefit." *Ibid.* Distinguishing "between services, programs, or activities and the facilities in which they are administered," the court reasoned that the ADA does not protect mere access to pubic buildings; instead, "Title II's private right of action is specifically intended to remedy interference with a disabled individual's participation in, or benefitting from, a public service, program, or activity" conducted within a public building. *Id.* at 535 (citing *San Francisco v. Sheehan*, ---U.S. ---, 135 S. Ct. 1765, 1773 (2015)). The court concluded that "facility accessibility is not, standing alone, a cognizable claim under Title II's private right of action; rather, the inquiry is tied to whether that facility's inaccessibility interferes with access to public services, programs, or activities." *Id.* at 536.

Extrapolating from this holding, defendant MDOC and third-party defendant WCRC argue that (1) in order to raise a viable claim against a public entity under Title II of the ADA, a plaintiff must allege not only that a "facility" is inaccessible, but also that, as a consequence of the alleged inaccessibility, he or she was denied the full benefit of some "service" provided by the defendants, (2) sidewalks, parking spaces, and roadways are "facilities" and not "services," and the complaint alleges nothing more than that certain sidewalks, roadways, and parking areas within the city limits do not conform with applicable ADA Accessibility Guidelines, and (3) therefore, because the complaint alleges nothing more than technical accessibility defects in certain "facilities," the pleadings are insufficient as a matter of law to state any claim against any public entity defendant. This argument is flawed for several reasons.

*First*, the MDOC and WCRC ignore the command of 28 C.F.R. § 35.151. The crux of the plaintiffs' amended complaint is that, due to numerous specific accessibility defects in the curbs,

roadways, parking spaces and lots, and sidewalks within the City of Chelsea, they are unable safely to navigate the City's pedestrian throughways, and they have been denied the full enjoyment and benefit of the City's public services such as municipal parking, parades, and City-sponsored festivals. The plaintiffs also allege that the sidewalk and curb defects make it impossible for them to traverse some public pedestrian routes at all, or to access certain public buildings such as the library. They contend that the problems have in some cases been caused by the removal of accessibility features that already were present. And they maintain that the City, State, and County all have ignored the positive, specific mandate of 28 C.F.R. § 35.151, which required those entities, when building or repairing various public sidewalks after January 1992, affirmatively to ensure that the design and construction of those features adhered to specific technical provisions of the ADA Accessibility Guidelines.

The plaintiffs contend that the defendants — severally and jointly — have engaged in substantial construction or reconstruction projects within the city limits in recent years, and they repeatedly have failed or refused to incorporate specific accessibility features mandated by the ADAAG. It has been widely accepted by the federal courts, including the Supreme Court, that section 35.151 imposes a specific mandate on public entities to comply with the ADAAG in all new construction projects:

> As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. *In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards.* 28 C.F.R. § 35.151 (2003). But in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services. § 35.150(b)(1). Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes.

*Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (emphasis added).

The State and County defendants contend that they are obligated under state law only to maintain the paved driving surface of the roads within their respective rights of way, and that they have no duty to maintain sidewalks in any accessible condition — or, indeed, to provide any sidewalks at all. That may be true. But the complaint alleges — and the defendants do not dispute, at least for the purposes of these motions — that the State and County authorities have in fact undertaken on their own authority to build, rebuild, alter, and maintain sidewalks along at least some portions of M-52 and Old U.S. 12 after January 1992. All of those new construction and alterations projects plainly were subject to the mandate that "[e]ach facility or part of a facility constructed by, on behalf of, or for the use of a public entity *shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities*, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151(a)(1); *see also* 28 C.F.R. 35.150(b)(1) ("A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151."). Section 35.151 further expressly requires, with respect to "curb ramps" that "(1) Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and "(2) Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." 28 C.F.R. § 35.151(i). The plaintiffs plainly allege that the defendants have built or rebuilt curbs, sidewalks, and parking spaces without regard to those specific statutory requirements, and that, in some cases, the defendants have removed accessibility features that already were present, in order to replace them with accessibility obstacles.

*Second*, the County and State defendants contend that under *Babcock*, "sidewalks" are "facilities," not "services," and they insist that the amended complaint is fatally flawed because it does not identify a service, program, or activity from which they were excluded. The defendants essentially contend that they have no obligation at all under the ADA — even in the case of new construction — to include any specific accessibility features in any sidewalk or roadway construction project. But *Babcock* did not adopt any such counterintuitive reading of the ADA, and the defendants' position is sharply rebuked by both the plain language of the statute and by decades of case law.

For starters, the State and County defendants' position ignores the most apparent dispositive distinction between this case and *Babcock*: *Babcock* only involved complaints of accessibility defects in an *existing* facility, not new construction. *Babcock*, 812 F.3d at 536 ("ADA regulations *addressing existing facilities* provide that a public entity may comply with the ADA without altering a structure, such as by 'reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites . . . or any other methods that result in making its services, programs, or activities readily accessible.'" (citing 28 C.F.R. § 35.150(b), and 28 C.F.R. § 39.150(a)(1) ("noting that programs or activities must be 'readily accessible to and usable by handicapped persons,' but it is not 'necessarily require[d that] the agency make each of its *existing facilities* accessible to and usable by handicapped persons.'")) (emphasis added); *see also Cohen v. City of Culver City*, 754 F.3d 690, 699 (9th Cir. 2014) ("Sections 35.150 and 35.151 both implement, in different circumstances, the ADA's requirement that public entities make reasonable modifications to accommodate persons with disabilities. The less stringent demands of § 35.150 govern when it would be unreasonable to expect public entities to comply with

the more exacting standards of § 35.151."); *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 300 (5th Cir. 2012) ("The parking lot and the ramp have both been modified or constructed after 1992 and thus do not fall within the more flexible guidelines for existing facilities. Instead, the ADAAG guidelines apply.").

The majority opinion in *Babcock* did not discuss, or even cite, section 35.151, which imposes a more demanding and specific standard on newly constructed or altered public facilities, as opposed to older existing facilities that were built before 1992. As the Supreme Court noted in *Tennessee v. Lane*, and as the Sixth Circuit plainly held in *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir. 2004), section 35.151 imposes a positive mandate to ensure that all newly constructed public "facilities" — and in particular streets and sidewalks comprising pedestrian travel routes — include certain specific accessibility features:

> Pursuant to § 204, the Attorney General adopted 28 C.F.R. § 35.151, which provides that alterations of facilities commenced after January 26, 1992, "by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities." *Id.* § 35.151(b). *The regulation further specifies that alterations should meet certain accessibility standards*, id. § 35.151(c), *and that altered streets and pedestrian walkways must contain curb ramps. Id.* § 35.151(e). Section 35.151 is part of a broader regulatory scheme that aims to effectuate § 202 of the ADA. *See* 28 C.F.R. § 35.101.

*Ability Center*, 385 F.3d at 904 (emphasis added). The Sixth Circuit, relying on *Ability Center*, later considered and squarely rejected the position that the State and County now take here, holding instead that a plaintiff has "a private right of action to pursue her claims based on the failure of [a city] to comply with regulations concerning the accessibility of facilities." *Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015) ("Our test for intentional discrimination under Title

II of the ADA previously required that the discrimination be 'solely' because of the plaintiff's disability, [*see Dillery*, 398 F.3d at 567], but our decision in *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (*en banc*), rejected this sole-causation requirement."). The *Dillery* court held that the "[d]efendants' argument that Dillery does not have a private cause of action to pursue relief based on the ADA's accessibility regulations fails based on *Ability Center*." *Ibid.*

The *Babcock* panel did not abrogate or overrule *Ability Center* or *Dillery* — nor could it have — and the panel did not even suggest that it took issue with those binding, published decisions. In fact, in a footnote, the majority in *Babcock* carefully distinguished between complaints relating only to alleged defects in a "facility" comprising one specific public building — which the plaintiff had failed to allege was the home of any public service of interest to her — as compared with allegations of accessibility defects in public sidewalks, which the majority viewed as a hybrid of "facility" and "service" traditionally maintained by municipal entities. *Babcock*, 812 F.3d at 539 n.5. Discussing the competing opinions in *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc), the *Babcock* majority acknowledged that "the *Frame* majority emphasized that the public has a 'general demand' for 'safe transportation,' and so a 'sidewalk' qualifies as a 'service.'" *Babcock*, 812 F.3d at 539 n.5. The court declined to apply that reasoning to the general building features of Cadillac Place, because "[those] design features are not ordinarily 'provided in common to all citizens,' so we are hard-pressed to conclude that they qualify as 'services,' like sidewalks under the Fifth Circuit majority's approach." *Ibid.* Moreover, Judge Rogers in his concurrence specifically noted that *Babcock* left open the question whether "sidewalks" comprise "services" within the meaning of the ADA, and opined that they almost certainly do:

> While the majority relies substantially on the reasoning of the *Frame* dissent, the majority in this case carefully notes ways in which the case of sidewalks may be

different from the building designs before us.  *Ante*, at 538 n.5.  *Our decision today thus does not necessarily control a future case involving sidewalks.*  There is some room for the possibility that sidewalks may qualify as services even if the design features of a building do not.  A city's sidewalks are more critical to the everyday transportation needs of the general public than are the design features of a specific building.  *The conclusion that sidewalks may qualify as a service is supported by a 2004 decision from this court, a Title II implementing regulation, and the Justice Department's amicus briefs in several sidewalk cases.  Our judgment today does not resolve the question.*

*Babcock*, 812 F.3d at 543 (Rogers, J., concurring) (emphasis added).

*Third*, the defendants' position that they have no obligation to comply with the specific mandates of the ADAAG in constructing or altering *new* public sidewalks has been solidly rejected by the federal courts that have considered it.  Those courts repeatedly have held that when a public entity "builds new sidewalks or alters existing ones for reasons other than retrofitting to achieve ADA compliance, § 35.151 plainly requires it to build a curb ramp at every intersection unless doing so would be structurally impracticable."  *Cohen*, 754 F.3d at 698 (citing  28 C.F.R. § 35.151(i); *see also Fortyune v. City of Lomita*, 766 F.3d 1098, 1100 (9th Cir. 2014) ("In this case, we must decide whether Title II of the Americans with Disabilities Act ('ADA') requires local governments to provide accessible on-street parking in the absence of regulatory design specifications for on-street parking facilities. We hold that it does."); *Cohen*, 754 F.3d at 695 ("A city sidewalk is [] a 'service, program, or activity' of a public entity within the meaning of Title II."); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) ("Based on statutory text and structure, we hold that Title II and § 504 unambiguously extend to newly built and altered public sidewalks. We further hold that the plaintiffs have a private right of action to enforce Title II and § 504 to the extent they would require the City to make reasonable modifications to such sidewalks."); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) ("[M]aintaining public sidewalks is a normal

function of a city and without a doubt something that the City 'does.' Maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II." (quotations and citations omitted)).

Any sensible reading of ADA Title II compels the conclusion that maintaining public pedestrian thoroughfares for citizens to get around a city — and access the many public services and businesses located within — is the archetypal example of the most fundamental of public services. Inaccessible sidewalks are, in fact, the single most readily conceivable example of a basic obstacle to accessibility that comes to mind when considering the purpose that animates the ADA, which is to eliminate obstacles to the full enjoyment of public life by disabled citizens. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) ("To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life . . . ."). It is simply common sense: If disabled pedestrians cannot access the sidewalks, then they can hardly access anything else that a city has to offer.

*Fourth*, even under the defendants' crabbed reading of the rule of *Babcock*, the allegations here are sufficient to state a claim that the "facility" defects alleged have obstructed the plaintiffs' access to public "services." Leaving aside the question whether providing and maintaining pedestrian thoroughfares in the form of public sidewalks is itself a public "service" — though it certainly is under any reasonable construction of that term — the plaintiffs here plainly have alleged that the sidewalk and parking area defects of which they complain have prevented them from accessing numerous public services such as public parking lots and spaces, City-sponsored parades and festivals, and even the public library. The *Babcock* case plainly does not say what the State and

County think it says.  But even if it did, the allegations here are sufficient to pass muster under any reasonable reading of that decision.

B.

The State and County defendants also believe that their "roadway" construction projects — whether or not they also may involve constructing or altering sidewalks — are immune from scrutiny under the ADA because, even if they incorporate obvious accessibility obstacles, those defendants are not liable for any resulting denial of access to public "services," because any such services are not provided by them, but instead are provided by the City of Chelsea.  But the ADA makes no such distinction between the entity responsible for causing an obstruction and the (possibly separate) entity that provides a service that is obstructed by accessibility defects.  "Section 35.151 is part of a broader regulatory scheme that aims to effectuate § 202 of the ADA," *Ability Center*, 385 F.3d at 904, and that "scheme makes explicit that 'no qualified individual with a disability shall, *because a public entity's facilities are inaccessible* to or unusable by individuals with disabilities, be excluded from participation in, or *be denied the benefits of the services, programs, or activities of a public entity*, or be subjected to discrimination by any public entity,'" *ibid.* (quoting 28 C.F.R. § 35.149).

The regulations plainly state that no disabled person shall be denied the benefits of the "services of . . . a public entity" because "a public entity's facilities are inaccessible."  Nowhere does the statute state that "a public entity" must be the same entity that both provides a service and creates or maintains the inaccessible facility that obstructs access to it.  Nor can any such restriction sensibly be read into the law, since it is apparent that in many cases the agencies that construct and maintain government facilities and those that operate within or among those facilities will be entirely distinct.

-19-

If mere bureaucratic segregation between individual government agencies that build and maintain facilities and those that operate within them is all that is required to escape the mandate of the ADA, then the result would be that many — perhaps most — public facilities actually in existence today would be entirely exempt from the Act's accessibility mandate. Such a tortured reading of Title II of the ADA would lead to an unwarranted — and absurd — result.

Because the plaintiffs (and third-party plaintiff) have pleaded all the necessary elements of their claims under Title II of the ADA, the Rehabilitation Act of 1973, and the PWDCRA, the Court will deny the motions for judgment on the pleadings.

### III.

The plaintiffs also have moved for leave to file a second amended complaint to add the WCRC as a direct defendant. Such motions are treated with liberality, Fed. R. Civ. P. 15(a)(2), but they may be denied upon a showing of "undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999). Both the MDOC and the WCRC oppose the motion on futility grounds, citing the arguments discussed and rejected above. But the WCRC also contends that the motion should be denied because of the plaintiffs' undue delay, asserting that the plaintiffs knew for months that it was a potential defendant, but they did not seek leave to file an amended complaint until November 2016, more than three months after the third-party complaint was filed.

That argument is not persuasive. Delay alone does not justify denial of a motion brought under Rule 15(a). *Security Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1009 (6th Cir. 1995). Nor does the Rule establish a deadline within which a party must file a motion to

amend. *See Lloyd v. United Liquors Corp.*, 203 F.2d 789, 793-94 (6th Cir. 1953) (reviewing a district court's denial of a motion to amend after the entry of summary judgment). Of course, the party seeking to amend must "act with due diligence if it wants to take advantage of the Rule's liberality." *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (internal quotation marks omitted). But a party opposing an amendment based on delay must make "some significant showing of prejudice to the opponent." *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986). An amendment to a complaint prejudices a party where the amendment will require that party to prepare an additional defense strategy and expend additional resources to defend against new claims. *See Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973).

There was no substantial delay in moving for the amendment. The plaintiffs assert that they did not know when the original complaint was filed that it was the County and not the City that was primarily responsible for and in control of Old U.S. 12 within the city limits, and after they learned that fact as a result of the City's third-party complaint, some of the ensuing time was consumed by efforts to negotiate a settlement with all of the defendants, and some discussions about whether the County would or would not concur in a motion to amend. The County does not dispute those assertions.

The WCRC has made no credible showing of prejudice. It has been a party to the action since the third-party complaint was filed by the City. In its motion to dismiss the third-party complaint, the WCRC directly challenged the substantive allegations of the primary complaint, contending that it fails to state any claim on which relief can be granted against any of the defendants. And the WCRC essentially has responded to and participated in the litigation as a primary defendant since it was joined by the third-party complaint, including, as the plaintiffs

contend without dispute, by serving extensive discovery requests on the plaintiffs on November 11, 2016. The WCRC has not suggested any way in which it would be substantially prejudiced by a mere realignment of parties in the caption.

Finally, no purpose would be served by requiring the plaintiffs to file a separate action against the County in order to proceed against it directly. Moreover, although the County takes some issue with the exact scope of its authority, it does not deny that it has at least some substantial part of the responsibility for and control over the Old U.S. 12 right-of-way that runs through the City, and it does not deny that it has engaged in at least some construction and maintenance of that roadway during the time frame relevant to the complaint.

It is true that under the Court's scheduling order, discovery has closed and summary judgment motions are due. However, the parties have suggested and the Court is willing to entertain an adjustment to the deadlines to address any disadvantage that may have resulted from the timing of the present decision. The WCRC is free to present a proposal to amend the current schedule to alleviate any marginal prejudice that the realignment of the parties might cause.

IV.

The parties — or some of them — evidently engaged in settlement negotiations, and the plaintiffs and the City of Chelsea were able to reach a compromise that they ask the Court to embody in the form of a consent decree. The WCRC opposes the request on the grounds that it believes the claims in the amended complaint are without merit, the proposed settlement agreement is ambiguous and indefinite in scope, and entry of the consent decree may impair its ability to defend against the claims raised in the third-party complaint and proposed second amended complaint.

The plaintiffs assert that the decree does not purport to bind either the State or the County, and it does not resolve any claims other than those against the City itself. The plaintiffs point out that the decree contemplates that the parties to it will engage in discussions with the County and State before implementing or attempting to implement any measures that compliance with it may require. But if those entities remain uncooperative, the plaintiffs fully are prepared to proceed with the litigation against them concerning the roadway areas that are under their exclusive purview, and over which the City has no control.

"'A consent decree is essentially a settlement agreement subject to continued judicial policing.'" *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 871 (6th Cir. 2015) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). "Consent decrees typically have two key attributes that make them different from private settlements. First, when a court enters a consent decree, it retains jurisdiction to enforce the decree. In contrast, the parties to a private settlement typically must bring another suit (for breach of contract) to enforce it. Second, a consent decree puts 'the power and prestige of the court behind the compromise struck by the parties.'" *Ibid.* (quoting *Williams*, 720 F.2d at 920). "The same is not true of a dismissal order that does not incorporate the parties' terms." *Ibid.* "[C]onsent decrees are a prospective form of relief involving continuous court oversight. They are designed to be a flexible remedy, easily modifiable when the facts or law as to the parties change." *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1094 (6th Cir. 2016).

The force of a consent decree comes from "the parties' acquiescence, not rules of law." *City of Warren v. City of Detroit*, 495 F.3d 282, 287 (6th Cir. 2007) (citing *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986)). Therefore, only the parties who agree can be bound by it. Such a decree "'may not dispose of the claims of a third party, and *a fortiori*

may not impose duties or obligations on a third party, without that party's agreement.'" *Ibid.* (quoting *Firefighters*, 478 U.S. at 529).

These rules protect the WCRC from any adverse impact on it of the consent decree. The proposed consent decree binds only the parties to it, which are explicitly named to be the individual plaintiffs and the City itself. The decree even states that it does not purport to bind the other defendants. The parties to the decree apparently regard it as sufficiently specific for their purposes, and the County's concerns in that respect are immaterial since the decree imposes no duty of performance on any entity other than the City. The County vaguely alludes to fears that the compromise of the plaintiffs' claims as to the City may impair its ability to defend the claims against itself in this case, but it has not offered any factual or legal basis for that concern. None of the County's defenses to the claims against it, either as a third-party or a primary defendant, are or could be impaired or foreclosed by entry of a consent decree that binds only the plaintiffs and a separate public entity, where the County has not itself consented to entry of the decree. *Warren*, 495 F.3d at 286 ("At the outset, it is important to note that Warren is not a party to any of the consent judgments, is not bound by the judgments, and is entitled to its 'own day in court' to challenge actions taken under the judgments." (quoting *Martin v. Wilks*, 490 U.S. 755, 761-62 (1989))); *United States v. City of Miami*, 614 F.2d 1322, 1329 (5th Cir. 1980) ("Unless the [defendant] can demonstrate that it has been ordered to take some action by the decree, or ordered not to take some action, or that its rights or legitimate interests have otherwise been affected, it has no right to prevent the other parties and the Court from signing the decree.").

The cases that the County relies upon for the proposition that the Court must hold a hearing and approve a consent decree only after finding that it meets certain criteria of fairness of

reasonableness are inapposite, because they involved compromises of specific types of claims such as labor disputes or class actions, where extra attention by the Court is mandated by the applicable statutes or case law, or where the decree necessarily must foreclose the rights of absent parties. *See City of Miami*, 614 F.2d at 1330 (noting that only in "certain special situations [is] the trial court . . . required by statute or rule to approve a settlement to which the parties to the litigation have agreed," which include "proposed class action settlements, proposed shareholder derivative suit settlements, and proposed compromises of claims in bankruptcy court") (citations omitted). Otherwise, "an active role for the trial court in approving the adequacy of a settlement is the exceptional situation, not the general rule." *Id.* at 1331. No such unusual claims or concerns are present in this case, which does not involve any of the circumstances that typically would prompt close judicial scrutiny of a proposed settlement.

Finally, any concern of the parties (or the Court) as to the indefinite term of judicial supervision under the decree readily may be remedied by inclusion of an appropriate sunset date in the final version of the decree entered by the Court, or by a later motion to modify or terminate the decree.

## V.

The plaintiffs have stated valid claims in their first amended complaint under Title II of the ADA, the Rehabilitation Act of 1973, and the PWDCRA. There is no good reason why the plaintiffs should not be able to amend their complaint once again to plead their claims directly against the WCRC. Likewise, there is no valid reason for refusing the proposed consent decree between the plaintiffs and defendant City of Chelsea.

Accordingly, it is **ORDERED** that the motions for judgment on the pleadings [dkt. #26, 30] are **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for leave to file a second amended complaint [dkt. #34, 36] is **GRANTED**. The plaintiffs must file their second amended complaint on the docket **on or before May 23, 2017**.

It is further **ORDERED** that the joint motion to approve the consent decree [dkt. #31] is **GRANTED**. The plaintiffs and the Chelsea defendants must present their proposed decree to the Court **on or before May 30, 2017**. The parties should include a proposed date for termination of the Court's jurisdiction to enforce the decree, or an explanation why such a termination date is impractical.

It is further **ORDERED** that the parties must appear for a status conference on **May 30, 2017 at 4:00 p.m.** to discuss what adjustments, if any, should be made to the Case Management and Scheduling Order [dkt. #13], as amended [dkt. #47].

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   May 16, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 16, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI