## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

SHAUNA M. MOTE, DEBORAH CLARK,   )
CARLOS GRAY-LION, BRENDA BARANIAK, )   Case Number
KAREN STREET, MERLYN STREET,   )   16-11546
JENNIFER KUNDAK; LEE BENTON, by his   )
next friends, Ronald M. Benton and Marion   )   Honorable:
Benton, J.N., a minor, by next friends Daniel and )   David M. Lawson
Mary Jane Nelson, ANN ARBOR CENTER   )
FOR INDEPENDENT LIVING, INC., and,   )
JENNIFER KUNDAK, individually, and on   )
behalf all those similarly situated,   )
   )
      Plaintiffs,   )
v.   )   CLASS ACTION
   )   SECOND
CITY OF CHELSEA, CHELSEA DOWNTOWN   )   AMENDED
DEVELOPMENT AUTHORITY,  MICHIGAN   )   COMPLAINT
DEPARTMENT OF TRANSPORTATION, and   )
WASHTENAW COUNTY ROAD COMMISSION)
      Defendants.   )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CITY OF CHELSEA,

     Third Party Plaintiff,

v.

WASHTENAW COUNTY ROAD COMMISSION

     Third Party Defendant
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    1. Recently, the United States celebrated the twenty-fifth anniversary

of the Americans with Disabilities Act (ADA). According to Congress, fully

accessible sidewalks, street level transit stops, and pedestrian crossings are

the ADA's corner-stone:

> The employment, transportation, and public accommodation sections of this [Americans with Disabilities] Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets.

H.R. Rep. No. 101-485, pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367.

2. In Chelsea, people with mobility impairments, who use wheelchairs or other adaptive aid, find that Chelsea's streets and walks are not readily accessible to and usable by them. And while Chelsea is in some ways becoming more accessible, in other, critical ways, Chelsea is regressing in accessibility, by permitting downtown businesses to renovate while creating new steps and other barriers to access, and by Chelsea itself removing long existing curb ramps and replacing them with grass and new, solid curbs, among other practices, detailed below.

3. This lawsuit concerns only services, programs, activities and facilities located within the borders of the City of Chelsea. Plaintiffs bring this lawsuit to make defendants' facilities, services, programs and activities accessible according to law.

4. More than a decade ago, when interpreting the ADA, the federal Sixth Circuit Court of Appeals found:

> "[F]ailing to provide curb cuts and other accommodations in the course of altering city streets and sidewalks in violation of [*28 C.F.R.* ] *§ 35.151* denies the disabled meaningful

access to public services by perpetuating architectural barriers that impede such access…".

*Ability Center of Greater Toledo v City of Sandusky, Ohio*, 385 F.3d 901, 913-914 (6th Cir. 2004). However, ten years later, the majority of intersections in Chelsea lack one or more required ADA-compliant curb cuts. Making things worse with each new resurfacing project, defendants are removing existing curb cuts and replacing them with new solid curbs. And, the sidewalks and street level transit stops in between these missing curb cuts have many barriers making sidewalks dangerous for pedestrians with disabilities.

5. Individual Plaintiffs Shauna M. Mote, Deborah Clark, Carlos Gray-Lion, Brenda Baraniak, Karen Street, Merlyn Street, Jennifer Kundak, Lee Benton, through Next Friends, Ronald M. Benton and Marion Benton, and J.N., a minor, through next friends Daniel and Mary Jane Nelson, bring this lawsuit to make Chelsea accessible according to law. Each of these individuals lives, works, or frequently travels for business or pleasure throughout Chelsea Michigan. Each is a person with a mobility disability and has been personally discriminated against and subjected to hazardous conditions due to the access barriers at issue in this case. Each would benefit by the removal of these barriers.

6. The Ann Arbor Center for Independent Living, (AACIL) represents persons with disabilities throughout southeast Michigan, including Chelsea, who have been or will be discriminated against and subjected to hazardous conditions due to the access barriers at issue in this case. Previously, AACIL successfully brought similar lawsuits against the Michigan cities Monroe (in 2002), Ann Arbor (in 2004), and Ypsilanti (in 2005).

7. The Defendants are the City of Chelsea, the Chelsea Downtown Development Authority, ("DDA") the Michigan Department of Transportation, ("MDOT"), and the Washtenaw County Road Commission, ("WCRC").

8. Defendants—through defective construction and alterations, combined with insufficient maintenance and enforcement—have continuously failed to ensure that their sidewalks, street crossings, street level transit stops, and certain other facilities, services, programs and activities are readily usable by and accessible to Plaintiffs and others.

## II.   JURISDICTION AND VENUE

9. This is an action for declaratory and final injunctive relief, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 to 12213, specifically Title II of the ADA, and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., and Michigan's PWDCRA.

9.A. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504 of the Rehabilitation Act.

9.B. This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

9.C. Venue is proper under 28 U.S.C. § 1391(b) because each defendant is located in the Eastern District and the events and/or omissions giving rise to Plaintiffs' claims occurred inside the City of Chelsea, Michigan, in this District.

9.D. Jurisdiction in Count III is based on this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the Michigan State law claims arise out a common nucleus of facts with the federal law claims. In addition, the ADA and PWDCRA "substantially mirror" each other. *Donald v. Sybra, Inc.,* 667 F.3d 757, 764 (6th Cir. 2012). Therefore, "claims under both statutes are generally analyzed identically." *Steward v. New Chrysler,* 415 Fed. Appx. 632, 641 (6th Cir.2011).

### III.  PARTIES

10. Individual Plaintiffs Shauna M. Mote, Deborah Clark, Carlos Gray-Lion, Brenda Baraniak, Karen Street, Merlyn Street, Jennifer Kundak, Lee Benton, through Next Friends, Ronald M. Benton and Marion Benton, and J.N., a minor, through next friends Daniel and Mary Jane Nelson, each lives, works, or frequently travels for business or pleasure throughout Chelsea, Michigan.

11. Each individual Plaintiff has a mobility impairment, and must rely upon a wheelchair, braces, crutches, canes or other adaptive aids to move about Chelsea. Each named individual Plaintiff is a "qualified person with a disability" as defined by the Americans With Disabilities Act, and also under the Rehabilitation Act.

12. The Ann Arbor Center for Independent Living, Inc., (AACIL), operating throughout Washtenaw County, Michigan, in including in the City of Chelsea, is a nonprofit Michigan Corporation, and has employees, volunteers, clients and customers such as Deborah Clark and Shauna Mote, who live, work or travel throughout the City of Chelsea, and could bring this lawsuit on their own. AACIL's Board of Trustees and staff, composed of a majority of people with disabilities, was created to assure equality of opportunity, full participation, independent living and economic self-

sufficiency of people with disabilities by working to eliminate the attitudinal, environmental, architectural and communication barriers that perpetuate acts of discrimination toward people with disabilities, including sight impairment and mobility impairments. The AACIL has been advocating for and assisting people with disabilities in Southeast Michigan since 1976. The AACIL has suffered financial harm and has diverted resources due to defendants' discrimination, and it has members, clients and consumers who are suffering from Defendants' discrimination. Defendants' discrimination frustrates the mission of AACIL and has caused it financial harm and has forced it to divert funds and resources.

13. Each Plaintiff is being denied access to Defendants' facilities, programs, services or activities. Each Plaintiff continues to suffer from Defendants' failure to make streets, roads and highways, sidewalks or other street level pedestrian walkways readily accessible to and usable by Plaintiffs, and will benefit from the relief sought here.

14. Defendants the City of Chelsea, ("Chelsea") the Chelsea Downtown Development Authority ("DDA"), the Michigan Department of Transportation (MDOT), and the Washtenaw County Road Commission ("WCRC") are each public entities as that term is defined under 42 U.S.C. § 12131(l); 28 C.F.R. § 35.104.

15. Defendants are discriminating against Plaintiffs by denying access to facilities, programs, services and activities located within Chelsea.

## CLASS ACTION ALLEGATIONS

16. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the Named Plaintiffs bring this action, for final injunctive and declaratory relief purposes only, on their own behalf and on behalf of all persons similarly situated. The Named Plaintiffs seek to represent a class composed of all persons with mobility and/or vision disabilities who use and/or will in the future use Defendants' facilities, services, programs or activities within the City of Chelsea, Michigan, The claims asserted herein are solely for final injunctive and declaratory relief for the class; damage claims are not included in this complaint.

A. The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.

B. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that they, or their members, are all being denied, or will be denied, their civil rights of access to Defendants' facilities, services, programs or activities due to the barriers described herein.

C. Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that Defendants have failed to provide program access to Defendants' facilities, or have constructed or altered facilities without making the altered portions accessible according to law.

D. The named Plaintiffs are adequate class representatives because they, or their members, are directly impacted by Defendants' failure to provide program access to Defendants' facilities. The interests of the named Plaintiffs are not antagonistic to, or in conflict with, the interests of the class as a whole. The attorneys representing the class are experienced in representing clients in class action civil rights claims.

F. Claims of the named Plaintiffs are typical of the claims of the class as a whole because the Named Plaintiffs, or their members, are similarly affected by Defendants' failure to provide access to Defendants' facilities, services, program or activities.

G. Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate declaratory and final injunctive relief with respect to the class as a whole.

H. References to Plaintiffs shall be deemed to include each named plaintiff and each member of the class, unless otherwise indicated.

## Examples of Individuals Plaintiffs

17. Plaintiff Deborah Clark recently moved to the Chelsea area. She uses a wheelchair and has a service dog. Within the last three years, she first came to Chelsea and began to discover that she could not safely access Chelsea's sidewalks, street crossings, and municipal parking. Also, she found that many of Chelsea's downtown businesses lack an accessible entrance. Thus, Plaintiff Clark is segregated from almost every facility, service, program or activity, including on-street parking, the parades, the festivals, and the library in Chelsea. She risks her safety each time she attempts to use sidewalks, street crossings and municipal parking in Chelsea. She constantly encounters barriers to access each time she comes to town.

18. Plaintiffs Shauna Mote recently tried to use the new Jackson Street parking lot and the driveway and new walkways connecting to the parking lot to Middle Street. Although the DDA built these in 2014, they are not readily accessible to and usable by Plaintiff Mote, because they are too steep.

19. Plaintiff Carlos Gray-Lion lives very close to Congdon Street. During late 2015, Chelsea altered that stretch of Congdon and the sidewalks adjacent. But Chelsea removed a long existing curb cut, and replaced it with

grass and a new curb, and stopped the project just short of a crosswalk, leaving an old, inaccessible curb cut on one side, and steps on the other.

20. Plaintiffs Karen and Merlyn Street have recently learned that Chelsea removed long existing curb ramps in the Wilkinson Street area, and replaced them with grass and solid curbs

21. Annually, Defendants Chelsea and Chelsea DDA sponsor and host several festivals and two parades. Each Plaintiff has had to miss some of these events due to the lack of accessible municipal parking, accessible sidewalks and street crossings, and other access barriers at the various venues. These programs, services or activities are not readily accessible to and usable by Plaintiffs due in part to the lack of ADA complaint municipal parking, sidewalks and street crossings, including, but not limited to, along SR 52—Main Street.

22. Each Plaintiff suffers from this lack of access, as do similarly situated persons with disabilities who visit Chelsea to use these facilities, or to participate in these programs, activities or services, or merely to visit friends and shop. This is not an exhaustive, list, it is merely to illustrate the lack of access Plaintiffs seek to correct.

## EXAMPLES OF BARRIERS TO ACCESS

### Michigan State Route 52, Main Street, Chelsea

23. Throughout this Complaint, references to "Michigan State Route 52", "SR 52" and "Main Street" refer only to those portions that exist inside the physical borders of the City of Chelsea, Michigan.

24. State Route 52 runs uninterrupted from the north border of Chelsea through the south border of Chelsea. This stretch is a state trunk line highway.

25. MDOT is responsible for the maintenance of this stretch of SR 52.

26. MDOT has resurfaced this entire stretch of SR 52 from edge line to edge line after January 26, 1992. Some portions of the stretch have curbs. On these segments, MDOT has resurfaced from curb line to curb line after January 26, 1992.

27. After January 26, 1992, MDOT resurfaced this stretch of SR 52 inside Chelsea, but left in place one or more curbs or other barriers to an intersecting street level pedestrian walkway.

28. After January 26, 1992, along this stretch MDOT constructed or altered one or more sidewalks or other street level pedestrian walkways, but left in place one or more curb or other barrier to its intersection with SR 52.

29. After January 26, 1992, MDOT has constructed or altered one or more curb ramps or other sloped areas connecting street level pedestrian walkways with SR 52 inside Chelsea. The same is true for one or more curb ramps or other sloped areas where the sidewalks running parallel to SR 52 cross streets, roads or highways intersecting with SR 52.

30. After January 26, 1992, MDOT has granted permission to Chelsea to construct or alter one or more curb ramps or other sloped areas connecting street level pedestrian walkways with SR 52. The same is true for one or more curb ramps or other sloped areas where the sidewalks running parallel to SR 52 cross streets, roads or highways intersecting with SR 52.

31. After January 26, 1992, Chelsea has resurfaced or otherwise altered one or more streets intersecting with SR 52.

32. Chelsea exerts jurisdiction over all sidewalks within its borders. Chelsea's sidewalk ordinance admits that the regulated creation and timely upkeep of its system of sidewalks is necessary to the successful delivery of public safety services. For example, Chelsea regulates the types of items and displays individuals can place on sidewalks, mandates the removal of snow and ice from sidewalks, reserves the right to do so itself, charging and collecting from adjacent owners for doing so. Chelsea also makes it a crime to obstruct sidewalks. Chelsea also demands that those who wish to occupy

or otherwise hold events on public sidewalks to obtain a permit from the government. This also includes the sidewalks running parallel to SR 52.

33. Some of the intersections along this stretch have bump-outs. Some of these have been constructed or altered after January 26, 1992. MDOT constructed or altered some of these bump outs. MDOT granted Chelsea permission to construct or alter one or more of these bump outs.

34. There are sidewalks running parallel to both sides of SR 52 from its intersection with Commerce Park Drive on the south side of Chelsea through to just south of its intersection with Sibley Road. A sidewalk continues running parallel to SR 52 on its east side to Hickory Drive on Chelsea's north end.

35. Within the last three years, Chelsea installed some pedestrian cross walks crossing SR 52. MDOT approved the plans for these.

36. When Chelsea closes SR 52 for a parade or a festival, it obtains a permit or other permission from MDOT prior to the closing.

37. MDOT is aware that there is on-street parking existing along some portions of SR 52 inside the City of Chelsea. MDOT has granted permission for this parking. MDOT has striped these parking spaces. MDOT granted Chelsea permission to stripe these parking spaces. After January 26, 1992,

MDOT has resurfaced the asphalt upon which these on street parking spaces currently sit.

38. None of the on-street parking along SR 52 inside Chelsea is, to the maximum extent feasible, readily accessible to and usable by Plaintiffs.

39. The majority of curb ramps crossing SR 52 suffer from one or more of the following conditions: a running slope exceeding 8.33%, a cross slope exceeding 1:48, a top landing with slopes exceeding 1:48, changes in level exceeding ¼ inch, lips at transitions to street crossings, counter slopes exceeding 5%, holes or defects in the crosswalk or where the crosswalk meets the curb ramp. The same is true of the curb ramps on the sidewalks running parallel to SR 52.

40. In sum, the sidewalks, curb cuts and pedestrian crossings running parallel to and also crossing SR 52 have been constructed, resurfaced or otherwise altered after January 26, 1992, and are not, to the maximum extent feasible, accessible to and usable by Plaintiffs. They are barriers to Plaintiffs' access.

### Other Streets and Roads inside Chelsea

41. During year 2015, Chelsea resurfaced Congdon Street from its intersection with Lincoln Street to just short of its intersection with Middle Street. As a part of this project, Chelsea removed a long existing curb ramp

crossing Lincoln Avenue, planted grass in its place, and built new solid curbs at the NW and NE corners of the intersection of Congdon with Lincoln. This alteration created a lesser level of accessibility at that pedestrian crossing. Chelsea should never replace existing curb ramps with grass and a new curb. Instead of building new curbs, Chelsea should have installed curb cuts at both ends of those pedestrian crossings. http://www.ada.gov/dojfhwatasupplement2015.html , Q and A ## 3, 11 and 12. In addition, Chelsea resurfaced Congdon curb to curb for the entire two block span, but stopped just short of the pedestrian crossing of Condon where it intersects with Middle street, leaving that pedestrian crossing completely inaccessible. Upon information and belief, Chelsea did this to avoid its obligation to install these two new curb cuts. Id., at # 3.

42. During 2014, Chelsea and/or the DDA completed its Jackson Street Parking Lot project which included constructing a street from the parking connecting to Middle Street. These facilities violate the ADAAG standards, are too steep, and are not readily accessible to and usable by Plaintiffs.

43. Going back to January 26, 1992, Chelsea and or its DDA has resurfaced or altered many streets and roads, but left in place curbs or other barriers to street level pedestrian walkways. Throughout the City, Plaintiffs

cannot travel for more than a block or two without encountering non-ADA compliant slopes and changes in level, and other barriers to access.

44. Upon information and belief, going back to January 26, 1992, Chelsea and or its DDA has resurfaced or altered many streets and roads, and has built curb ramps or other sloped areas that suffer from one or more of the following conditions: a running slope exceeding 8.33%, a cross slope exceeding 1:48, a top landing with slopes exceeding 1:48, changes in level exceeding ¼ inch, lips at transitions to street crossings, counter slopes exceeding 5%, holes or defects in the crosswalk or where the crosswalk meets the curb ramp. Many of these curb ramps constitute tipping hazards.

### Sidewalks and other Street Level Pedestrian Walkways inside Chelsea

45. During year 2015, MDOT awarded Chelsea a Safe Route to Schools Grant. ("SR2S"). This was comprised of federal funds. Chelsea used this grant to fill in sidewalk gaps and to upgrade ADA curb ramps along key school routes within the City limits. The scope of the project included, among other things, filling in sidewalk gaps on Wilkinson, Wellington, Chandler, Grant and West Old U.S. 12; installing a rapid flash, pedestrian crossing on West Old U.S. 12 at Wilkinson Street, and upgrading ADA curb ramps and signage at numerous intersections along Pierce, Madison, Washington, Freer, Elm, Howard and McKinley Streets. Chelsea City Staff

conducted ongoing project inspections. As a part of this project, among other things, at some intersections Chelsea removed long existing curb ramps and replaced them with grass and built new solid curbs. At such places, the alteration resulted in a lesser level of accessibility. Chelsea altered street level pedestrian walkways but constructed new curbs and other barriers, or left in place existing curbs or other barriers to an intersecting street, road or highway. Also, at some intersections, Chelsea apparently limited the scope of the work to stop just before some pedestrian crossings, to avoid triggering new, accessible curb ramps.

46. Upon information and belief, going back to January 26, 1992, Chelsea and or its DDA has resurfaced or altered other walks, sidewalks and other street level pedestrian walkways, but has left in place a curb or other barrier to an intersection with a street , road or highway, or has built or left in place curb ramps or other sloped areas that suffer from one or more of the following conditions: a running slope exceeding 8.33%, a cross slope exceeding 1:48, a top landing with slopes exceeding 1:48, changes in level exceeding ¼ inch, lips at transitions to street crossings, counter slopes exceeding 5%, holes or defects in the crosswalk or where the crosswalk meets the curb ramp. Many of these curb ramps constitute tipping hazards.

## Chelsea's Municipal Parking

47. Throughout Chelsea, the City and/or the DDA has created, maintains, regulates and operates a system of municipal parking lots and also on-street parking.

48. Chelsea has a system of municipal parking lots, designated by a letter, e.g, Parking Lot A, etc. Each of the municipal lots has one or more designated spaces for persons with disabilities. Each of these has been restriped, resurfaced or otherwise altered after 1992. None of these are, to the maximum extent feasible, readily accessible to and usable by Plaintiffs. 28 C.F.R. 35.151(a) and (b). Each violates one or more of the measurements for accessible parking spaces. For example see: www.ada.gov/restripe.pdf; https://adata.org/factsheet/parking.

49. In addition, Chelsea has created, maintains, regulates and operates a system of municipal on-street parking. Chelsea has designated some of these on street parking spaces as reserved for those with disabilities. Chelsea has restriped, resurfaced or otherwise altered each of these spaces after 1992. Almost all of these spaces have a surface slope exceeding 1:48. In addition, many lack a clear space to deploy a ramp, and the surface to deploy the ramp suffers from slopes exceeding 1:48, among other defects. As a result, these designated on-street parking spaces None of these are, to the maximum

extent feasible, readily accessible to and usable by Plaintiffs. 28 C.F.R. 35.151(a) and (b).

50. The City the DDA and MDOT's provision of on-street parking is a "service, program or activity" of defendants. See *Fortyune v City of Lomita*, 766 F.3d 1098, 1102-03 (9th Cir. 2014). When viewed in its entirety, it is not readily accessible to and usable by Plaintiffs.

51. When the City and its DDA advertise the Sights and Sounds Festival, they provide a map of the municipal parking and claim that it is ADA accessible. But municipal parking is not readily accessible to and usable by Plaintiffs.

51.A. Snow and ice make each of these barriers worse. At times, each Plaintiff has had to avoid downtown Chelsea for extended periods due to snow and ice.

### Defendant Chelsea and DDA's Festivals and Parades

52. Along with its other services, program and activities, Defendant Chelsea also sponsors and otherwise hosts several public festivals and Parades. Some of these are:

A. The Chelsea Community Fair. This occurs annually in late August, at the Chelsea Community Fairgrounds. The fair is not fully accessible. As a part of the Fair, Chelsea and the DDA sponsor and host a parade, which

begins near Middle Street in downtown Chelsea, and proceeds down SR 52 (Main Street) through Chelsea to the Fairgrounds. Plaintiff Deborah Clark would like to participate in the parade, or at least watch it, but has not been able to do so due to the lack of accessible municipal parking, sidewalks, and street crossings, complained of above. Similarly, all Plaintiffs have been and will continue to be hindered from the event due to lack of access.

B. The Sights and Sounds Festival. Chelsea and the DDA Sponsor and host this three day event, which is scheduled this year for July 28-30, 2016. It has eleven stages, and a social tent, a food court, many musical acts, and other artist. The majority of these are located on Chelsea municipal property, including some municipal parking lots and sidewalks, and are all either on SR 52 or within a block of it. Because the musical acts change each year, each Plaintiff has a new opportunity to miss an act or multiple acts that he or she may wish to see, because it is not readily accessible to and usable. Due to the lack of accessible municipal parking and the inaccessible sidewalks throughout Chelsea, this service, program or activity is inaccessible to Plaintiffs.

C. Sights and Sounds on Thursday Nights: Chelsea and the DDA Sponsor and host this program, service or activity for two hours each Thursday night for approximately eleven weeks. It uses the same stages as

those for the Sights and Sounds Festival, and has all of the barriers to access as listed above. Because the musical acts change each Thursday night and each year, each Plaintiff has a new opportunity to miss an act he or she may wish to see, because it is not readily accessible to and usable.

D. The Hometown Holiday Festival: Chelsea and the DDA sponsor and host this service, program or activity, each December. Likewise, it is held in downtown Chelsea, and the lack of accessible municipal parking and accessible sidewalks make it inaccessible to Plaintiffs.

E. Plaintiffs and all those similarly situated can only enter the Chelsea Community Fairgrounds by two entrances, both located on WCRC roads— Old Manchester Road and Old U.S. Highway 12. At the Fair's Eastern entrance, crossing Old Manchester, there is a painted crosswalk with solid curbs at both ends. This pedestrian crossing is inaccessible to Plaintiffs.

F. During year 2007, WCRC, "in cooperation with" MDOT, resurfaced Old U.S. Highway 12 from approximately its intersection with Wilkinson Street through just west of its intersection with Main Street, (S.R. 52). This included the "approaches" of each intersection along this stretch. Federal funds were used for this.

G. As a part of this resurfacing, WCRC installed two curb ramps crossing Old 12 at Wilkinson. WCRC installed four curb ramps at each

intersection of Old 12 with Lane, Arthur and Taylor Streets. WCRC installed two curb ramps crossing the entrance to the Mall. The Chelsea Community Fair's "handicapped" entrance located on this stretch of Old U.S. 12. The curb ramps crossing Old 12 at Wilkinson, Lane and Arthur lack stop control. The speed limit is 45 m.p.h. on Old 12.

H. Some of these curb ramps suffer from excessive running slopes. Some of these curb ramps suffer from excessive cross slopes. Most of these curb ramps have abrupt changes at their transition to the streets. Most of these curb ramps collect water during rain and snow. This water ponds on the ramp surfaces. The moisture evaporates leaving sand, stones, dirt and other debris on the ramp surfaces. Only by re-grading the street and road asphalt at these transitions can this ponding of water be ended. In sum, the majority of these curb ramps are not readily accessible to and usable by Plaintiffs. The same is true of the two WCRC curb ramps at the crossing Silver Maples Drive at the intersection with Old U.S. 12.

I. Withing the last two years, Plaintiffs Shauna Mote and Deborah Clark attempted to use these curb ramps, and found them to be not readily accessible to and usable by them. These WCRC curb ramps presented a serious tipping hazard. These inaccessible curb ramps hindered these Plaintiffs from entering the Chelsea Community Fair "handicapped"

entrance and from enjoying the Fair Parade. They also prevent access to the Hometown Holiday Parade.

53. Many of the Plaintiffs know each other. Each Plaintiff's residence is fully accessible, but it operates as an oasis, due to the fact that the nearby pedestrian crossings, sidewalks and other street level pedestrian walkways, and other services, programs and activities each suffer from the defects described herein. Each Plaintiff is hampered from inviting other Plaintiffs and similarly situated friends from joining them in exercising or otherwise participating in everything others take for granted throughout Chelsea.

54. And, snow and ice make each of these barriers to access worse. Each Plaintiff has had to avoid downtown Chelsea for extended periods due to snow and ice on the sidewalks, curb ramps and street crossings, and municipal parking. Defendants' plowing operations and property owners need training in how to avoid these barriers to access.

55. **<u>Summary of Examples of Defendants' Discrimination</u>**. The above examples are not exhaustive. Rather, they are illustrations of several of policies followed by each Defendant, that, taken together, render Defendants' facilities, services, programs and activities, when viewed in their entirely, not readily accessible to and usable by Plaintiffs and class members. Without Court intervention to correct Defendants' discrimination,

these will remain not readily accessible to and usable by Plaintiffs and class members.

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION: CLASS-WIDE FINAL INJUNCTIVE RELIEF CLAIM UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT

56. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 55 above, inclusive. Plaintiffs bring this count for class-wide declaratory and final injunctive relief, but not money damages, under Title II of the Americans With Disabilities Act (ADA).

57. Title II of the ADA prohibits covered public entities from denying individuals with disabilities "the benefits of " any "program" or "activity" or "service[]" of a covered entity on the basis of disability. 42 U.S.C. 12132. As the Supreme Court has recognized, those statutory terms are unambiguously broad. See *Pennsylvania Dep't of Corr.* v. *Yeskey*, 524 U.S. 206, 212 (1998). Section 504 specifically provides that "the term 'program or activity' means *all of the operations of* " a covered public entity, 29 U.S.C. 794(b) (emphasis added), and Congress required Title II to be interpreted at least as broadly as Section 504, see 42 U.S.C. 12201(a).

58. Among other things**,** Title II of the Americans With Disabilities Act requires that when a public entity builds or alters[1] any part of a facility after January 26, 1992, it shall, to the maximum extent possible, be altered so that it is readily accessible to and usable by individuals with disabilities. 42 U.S.C. §§ 12132; 28 C.F.R. § 35.151(a), (b) & (i). This includes, among other things, resurfacing or other alterations of Defendants' roads and walks. *Ability Center*, 385 F.3d 913-914; *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011); *Kinney v. Yerusalim*, 9 F.3d 1067 (3rd Cir.1993)(*cert. denied sub nom Hoskins v. Kinney*, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994). Many of defendants' roads, walks and parking lots at issue in this lawsuit have been "altered" after 1991 "by, on behalf of, or for the use" of each of the Defendants", but are not "to the maximum extent possible readily usable by and accessible to" Plaintiffs. *Id*. Indeed, as set forth in the facts above, Defendants' street level transit stops, pedestrian crossings, sidewalks and other street level pedestrian walkways deny access to Plaintiffs. And, each altered walk, road and curb cut must meet the ADA Standards. 28 C.F.R. § 35.151(c). By altering sidewalks and other street level pedestrian walkways without making them, to the maximum extent feasible, accessible to and

---

[1] Throughout this document "alter, altered, or alteration" have the definition set forth in Joint Technical Assistance July 2013 and its Supplemental Q and A January 2015. These are available at on the USDOJ website as http://www.ada.QOv/doj-fhwa-ta-supplement-201S.htm I.

usable by Plaintiffs, each Defendant violates the ADA. *Ability Center,*

*supra, Kinney, supra, and Frame, supra*.

59. Title II regulations promulgated by the Department of Justice state

that "[n]o qualified individual with a disability shall, on the basis of

disability, * * * be denied the benefits of the services, programs, or activities

of a public entity." 28 C.F.R. 35.130. As stated herein, Defendants' are

providing services, programs or activities that, when viewed in their entirety,

are not readily accessible to and usable by Plaintiffs. As the Sixth Circuit

recently stated:

> The conclusion that sidewalks may qualify as a service is supported
> by a 2004 decision from this court, a Title II implementing regulation,
> and the Justice Department's amicus briefs in several sidewalk cases.

*Babcock v Michigan*, 812 F.3d 531, 543 (6th Cir. 2016) (Rogers, concurring).

"The agency's interpretation of its own regulations is entitled to substantial

deference." Id., at 544.

60. As the Department of Justice has stated, the curb ramp

requirements in the Title II regulations were premised on the view that

"maintenance of pedestrian walkways by public entities is a covered

program." 60 Fed. Reg. 58,462 (1995) (notice of proposed rulemaking). That

position, embodied in the Department of Justice's regulations implementing

Title II, is entitled to substantial deference. See *Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

61. Moreover, in subsequent legislation, Congress has explicitly recognized that "public sidewalks" are covered by Title II. Section 1108 of the Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, 112 Stat. 107 (23 U.S.C. 133(b)(3)), which was passed in 1998, authorizes the use of federal funds set aside for transportation improvements undertaken by the States for "the modification of public sidewalks to comply with the Americans with Disabilities Act of 1990."

62. Providing and maintaining a network of walkways for pedestrians to get around town is a quintessential, not to mention ages old, government service. A city's provision and maintenance of sidewalks, curbs, on-street parking and parking lots clearly constitute a "service[], program[], or activit[y]," 42 U.S.C. 12132, under Title II of the ADA. As the Ninth Circuit held in *Barden*, "maintenance of public sidewalks * * * is a normal function of a municipal entity." *Barden* v. *City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002), cert. denied, 539 U.S. 958 (2003) (sidewalks are a service, program or activity for purposes of the ADA, and are a service or program for purposes of Section 504). And, as the Supreme Court has recognized in another context, the provision of sidewalks is an archetypal "general

government service[].” *Everson* v. *Board of Educ.*, 330 U.S. 1, 17-18 (1947) (noting that there is no Establishment Clause difficulty in giving churches access to “such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks”). Sidewalks permit the public not only to stay clear of road traffic, but to access shops and businesses, means of public transportation, places of employment, and government offices and facilities. And for “time out of mind,” sidewalks have been used for the purpose of public association and speech. *Boos* v. *Barry*, 485 U.S. 312, 318 (1988) (quoting *Hague* v. *CIO*, 307 U.S. 496, 515 (1939) (opinion of Roberts, J.)).

63. Likewise, the City, the DDA and MDOT’s provision of on-street parking is a “service, program or activity” of defendants. See *Fortyune*, 766 F.3d 1102-03. None of these parking spaces is accessible to Plaintiffs. When viewed in its entirety, it is not readily accessible to and usable by Plaintiffs.

64. After constructing or altering a facility, each Defendant “shall maintain in operable working condition those features of facilities that are required to be readily accessible to and usable by persons with disabilities by the Act.” *28 C.F.R. § 35.133*. Facilities required to be accessible include roads, walks, passageways and parking lots. *28 C.F.R. § 35.104*. As set forth herein, each Defendant routinely fails to do this.

65. Defendants' conduct in failing to maintain accessible facilities by failing to replace crumbling and uneven pavement, remove protruding and/or moveable obstructions, ensure a sufficiently wide path of travel, correct excessive cross-slopes and running slopes on roads and walks, failing to timely remove snow and ice, failing to remove gravel and other detritus from walks and curb ramps, and failing to provide compliant accessible street level transit stops thus constitutes unlawful discrimination on the basis of disability in violation of Title II of the ADA.

66. Each defendant is denying Plaintiffs participation in the services, programs or activities of on-street parking, parades, festivals and the community fair due to lack of access to them. Applying the general prohibition to facilities, the regulations provide that no one with a covered disability "shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity." 28 C.F.R. 35.149. And the regulations expressly define "facility" to include "roads" and "walks" controlled by a public entity. 28 C.F.R. 35.104.

67. Each Defendant is violating Title II's access requirements set forth in 28 C.F.R. § 149 (the general prohibition against discrimination); 28 C.F.R. § 150 (requiring accessibility of facilities existing prior to January 26,

1992, the effective date of Title II); and, 28 C.F.R. § 151 (requiring that facilities newly constructed or altered after January 26, 1992 be fully accessible).

68. Defendants' inaccessible parking, sidewalks and street crossings stop Plaintiffs from participating in Defendants' services, programs or activities, such as municipal parking lots, on-street parking, yearly parades, festivals, fairs and the like, as well as a lack of an accessible route to and from the Courthouse, Police Station, City Hall, Post Office and Secretary of State's offices.

69. Defendants' conduct constitutes an ongoing and continuous violation of the ADA and unless restrained from doing so, Defendants will continue to violate the ADA. Said conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law. Consequently, Plaintiffs are entitled to final injunctive relief pursuant to section 308 of the ADA 42 U.S.C. § 12188, and reasonable attorneys fees.

## SECOND CAUSE OF ACTION:
## CLASS-WIDE CLAIM UNDER THE REHABILITATION ACT OF 1973

70. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 69, above, inclusive. Plaintiffs bring this count pursuant to Section 504 of the Rehabilitation Act (RA) for class-wide declaratory and final injunctive relief, but not monetary relief.

71. Section 504 of the Rehabilitation Act (RA) prohibits covered public entities from denying individuals with disabilities "the benefits of " any "program" or "activity" of a covered entity on the basis of disability. 29 U.S.C. 794(a). As the Supreme Court has recognized, those statutory terms are unambiguously broad. See *Yeskey*, 524 U.S. 206, 212 (1998). Section 504 specifically provides that "the term 'program or activity' means *all of the operations of* " a covered public entity, 29 U.S.C. 794(b) (emphasis added).

72. The RA provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (Section 504 of the RA).

73. The RA defines "program or activity" as "all of the operations of" a qualifying local government. 29 U.S.C. § 794(B)(1)(A). This includes Defendants' sidewalks, other street level pedestrian walkways, transit stops and on-street parking. *Barden, supra; Ability Center, supra*; *Frame, Fortyune, supra*.

74. The RA also mandates each Defendant to make each "facility" accessible according to law. "The regulations define 'facility' as including

'roads, walks, [and] parking lots.' *28 C.F.R. § 39.103*." *Ability Center, 385 F.3rd 911, n. 10.*

75. Upon information and belief, at all times relevant, each Defendant has received federal financial assistance, which each has spent on one or more of the alteration projects complained of herein.

76. Each plaintiff (1) has a disability; (2) is and has been otherwise qualified to participate in Defendants' federally funded programs or activities; and (3) was denied the benefits of the programs or activities or was otherwise subject to discrimination because of his or her disability.[2]

77. As detailed above, beginning with the effective date of the Rehabilitation Act, and continuing each year to the present, each Defendant has received federal money but has spent it engaging in a continuing pattern and practice of over-arching discrimination against Plaintiffs and class members by denying the benefits of, or subjecting them to discrimination under several programs or activities receiving Federal financial assistance.

78. Plaintiffs are entitled to declaratory relief, to final injunctive relief ordering each Defendant to bring these facilities, programs or activities into compliance, and Plaintiffs reasonable attorneys fees and costs.

---

[2] Although the Rehab Act—passed in 1973—uses the term "handicapped", Congress in the late 1980s stopped using this term because "individuals with disabilities find the term 'handicapped' objectionable." *Helen L. v. Didario*, 46 F.3d 325, 333 n8 (3rd Cir. 1995).

## COUNT THREE:
## MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

79. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 78 above, inclusive. Plaintiffs do not bring this claim against MDOT. Plaintiffs bring this count for declaratory and final injunctive relief, but not for monetary damages, solely against defendant City of Chelsea and defendant Chelsea DDA. The above complained of failure by these two defendants to construct, alter and maintain their services, programs or activities to be accessible to Plaintiffs violates Michigan law at M.C.L. § 37.1301-02. Plaintiffs are entitled to final injunctive and declaratory relief, attorney fees and costs.

80. The Michigan Persons with Disabilities Civil Rights Act (PWDCRA) is built upon similar policy objective and legal standards as the ADA, and the ADA and PWDCRA "substantially mirror" each other. *Donald v. Sybra, Inc.,* 667 F.3d 757, 764 (6th Cir. 2012). Therefore, "claims under both statutes are generally analyzed identically." *Steward v. New Chrysler,* 415 Fed.Appx. 632, 641 (6th Cir.2011).

81. Defendants Chelsea and Chelsea DDA are a "public service" subject to the PWDCRA's Article 3. MCL 37.1301(b). Each Plaintiff has "a disability" as defined in the statute. MCL 37.1103(d)(i)(B). Further, just as with the ADA's "qualified individual with a disability" provision, each

Plaintiff's disability is "unrelated" to his or her ability to utilize and benefit from the city streets, pedestrian walkways and street level transit stops, with the accommodation their mobility devices. MCL 37.1103(l).

82. The PWDCRA provides that a public service cannot:

Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a . . . public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by any individual of adaptive devices or aids.

83. MCL 37.1302(a). Each Defendant's streets, pedestrian crossings, street level pedestrian walkways, transit stops, municipal parking lots and on-street parking, parades, festivals and community fair are "services and facilities" of each Defendant. "Facilities include roads and walks". *28 C.F.R. § 35.104.*" *Ability Center, 385 F.3rd 904, n. 3*. Also see, *Barden; Frame, supra.* "The public streets [and sidewalks and other street level pedestrian walkways] involved in this case are plainly 'services,' 'facilities,' and 'advantages,' provided and regulated by [each] Defendant." *Bertrand v. City of Mackinac Island*, 256 Mich App 13; 662 NW2d 77 (2003)(analyzing the PWDCRA's duties to pedestrians with disabilities).

84. Defendants Chelsea and Chelsea DDA have violated the PWDCRA by denying each Plaintiff the full and equal enjoyment of the

streets, sidewalks and other pedestrian walkways despite Plaintiffs' ability to use and benefit from these if provided with the accommodation required by the statute. MCL 37.1102(2).

85. Plaintiffs are entitled to declaratory relief, to final injunctive relief ordering these two Defendants to bring these services, programs or activities into compliance, and Plaintiffs reasonable attorneys fees and costs.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. An final injunctive order and judgment enjoining each Defendant from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Defendants Chelsea and Chelsea DDA from violating Michigan's Persons with Disabilities Civil Rights Act;

B. A final declaration that the services, programs, activities and facilities listed herein under the jurisdiction of Defendants, including the streets, roads and highways, street level transit stops, sidewalks, and other street level pedestrian walkways, are constructed, designed, and/or maintained in a manner which discriminates against Plaintiffs and which fails to provide program access for persons with disabilities as required by law;

C. An final injunction ordering Defendants to correct the access barriers according to law;

D. Plaintiffs' reasonable attorneys' fees, litigation expenses, and costs;

E. Such other and further relief as the Court deems just and proper

Respectfully submitted,

J. Mark Finnegan (P68050)
Denise M. Heberle (P64145)
HEBERLE & FINNEGAN PLLC
2580 Craig Road
Ann Arbor, MI 48103
734-302-3233
734-302-3234 (fax)
hffirm@comcast.net

Attorneys for Plaintiffs

**Proof of Service**

The undersigned certifies that on this 22nd day of May, 2017, that a copy of the foregoing document was served by electronic means or via direct email, and/or by first class mail upon the attorneys of record.

J. MARK FINNEGAN