UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAUNA M. MOTE, DEBORAH CLARK,
CARLOS GRAY-LION, BRENDA BARANIAK,
KAREN STREET, MERLYN STREET,
LEE BENTON, by his next friends RONALD M.
BENTON and MARION BENTON, J.N., a minor,          Case Number 16-11546
by his next friends DANIEL and MARY JANE          Honorable David M. Lawson
NELSON, ANN ARBOR CENTER FOR
INDEPENDENT LIVING, INC., and
JENNIFER KUNDAK,

            Plaintiffs,

v.

CITY OF CHELSEA, CHELSEA DOWNTOWN
DEVELOPMENT AUTHORITY, MICHIGAN
DEPARTMENT OF TRANSPORTATION, and
WASHTENAW COUNTY ROAD COMMISSION,

            Defendants,

and

CITY OF CHELSEA,

            Third-party plaintiff,

v.

WASHTENAW COUNTY ROAD COMMISSION,

            Third-party defendant.
_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY
DEFENDANT MICHIGAN DEPARTMENT OF TRANSPORTATION, GRANTING IN
PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT BY
DEFENDANT WASHTENAW COUNTY ROAD COMMISSION, DENYING MOTION
FOR RECONSIDERATION BY DEFENDANT MICHIGAN DEPARTMENT OF
TRANSPORTATION, DENYING MOTION FOR SUMMARY JUDGMENT BY
DEFENDANT CITY OF CHELSEA, AND ORDERING STATUS CONFERENCE**

This case is before the Court again on the second round of dispositive motions in this municipal sidewalk accessibility dispute brought under the Americans With Disabilities Act (ADA), the Rehabilitation Act, and their state-law counterpart. The Court previously denied motions to dismiss filed by defendants Washtenaw County Road Commission (WCRC) and Michigan Department of Transportation (MDOT). *Mote v. City of Chelsea*, 252 F. Supp. 3d 642 (E.D. Mich. 2017). The plaintiffs since have filed a second amended complaint, and discovery has closed. Defendants WCRC and MDOT now have filed motions for summary judgment, presenting many of the same legal arguments raised and rejected earlier. Each defendant has raised additional arguments, however, some of which merit dismissal of part of the plaintiffs' claims. The Court will grant in part and deny in part the defendants' motions for summary judgment.

## I.

The plaintiffs are individual disabled persons, who live, work, or frequently travel to and within the City of Chelsea, Michigan, and who each require the use of a wheelchair, braces, cane, or other assistive devices in order to get around, along with the Ann Arbor Center for Independent Living (AACIL), which is an association that represents disabled persons such as the plaintiffs throughout southeastern Michigan, including in Chelsea. Together, and on behalf of persons similarly situated, the plaintiffs complain that the public streets and sidewalks in the City of Chelsea are less than fully accessible, at least in part because of construction and renovation work done on public sidewalks and streets by the City of Chelsea, the WCRC, and MDOT, which either removed, omitted, or improperly constructed accessibility features. The plaintiffs also initially complained about accessible public parking, but they have not developed those claims and appear to have abandoned them.

The parties have furnished drawings and diagrams of some of the intersections. Their "Ramp Location Index" identifies each intersection's potential ramp location with ordinal numbers "1" through "8," beginning with the northwest corner of an intersection — ramp "1" is the south-facing location — then proceeding clockwise until the southwest corner, with "8" being the north-facing location. (In the case of a "T" intersection, at least two of the ordinal locations would be inapplicable.). Those designation will be used here. The following fact summary is taken from the parties' affidavits, declarations, and authenticated documents. We begin with the circumstances of the individual and institutional plaintiffs.

## A. Individual Plaintiffs
### 1. Shauna Mote

In 2005, plaintiff Shauna Mote was in a car accident, and her injuries resulted in the amputation of both her legs. She now uses an adapted van with hand controls for transportation, which has a side fold-out ramp that she uses to exit the vehicle. Before her accident, she never used the sidewalks or curb ramps along US-12, but in 2015 a new friend suggested to her that a good way to meet people was to participate in the fairs and parades held in town. In August 2016 Mote attempted to travel the pedestrian route along US-12 for the first time, in order to meet with her friend for the "Old 12 Childrens Fair Parade." She also attempted to attend the "Chelsea Summer Fair Children's Parade" on an unspecified date in 2016. While traveling the sidewalk route along US-12, Mote observed several ramps with excessive running slopes, one of which was so steep that it caused the front wheels of her wheelchair to come up off the ground at the top. She also found it hard to navigate the ramps across US-12; at one location an excessive cross-slope on the ramp almost caused her to roll into traffic, and at another crossing police had to stop traffic to allow Mote and her friend to try to cross the street. However, upon crossing the street Mote and her friend were

"confronted with a very steep curb ramp that was also covered with mud, weeds, and gravel several inches deep," and as "a result we had to avoid that curb ramp entirely and use a different ramp, which forced us to travel along Old 12, with our police escort." On other occasions, Mote has found many of the curb ramps to be flooded with water and mud, requiring her husband to push her wheelchair with great difficulty; Mote averred that she would not have been able to make the passage in her wheelchair without his aid. As a result of these and other problems with the US-12 curb ramps, Mote has not been able to access the Lake Pierce Boardwalk either alone or with the assistance of friends.

Mote did not identify the specific intersections with the offending ramps.

As to M-52, Mote attested only that there are no accessible or handicapped-placarded parking spaces anywhere in the street parking along M-52; the normal spaces marked out on that street do not have enough width to allow deployment of her van's ramp; and, as a result, she has had to forego attending music festivals in town, or is forced to "park far away, and risk [her] health and safety using the very inaccessible and unsafe curb ramps, street crossings and sidewalks along SR-52 (Main Street)."

## 2. Deborah Clark

Plaintiff Deborah Clark has a wheelchair-modified van and a motorized wheelchair that she uses to get around. She first met friends who lived in Chelsea and visited there in 2014. Before August 2014, she never had occasion to visit the City or use any of the sidewalks there. In August 2014 Clark attended the Chelsea Summer Fair Parade, which ran along US-12, and, after parking in an accessible space by the shopping mall, she used six curb ramps installed by defendant WCRC to reach a spot where she could view the parade. The excessive slope on some of those ramps

caused her wheelchair to tip, and gaps where some ramps met the sidewalk caused her wheels to get stuck, resulting in Clark having difficulty controlling her chair and her service dog.  In 2015 Clark decided not to attend the parade, to avoid facing the same difficult trek.

In 2015 or 2016, Clark learned that a new pedestrian crossing was installed across US-12 leading to the Lake Pierce Boardwalk.  However, when it rains Clark has observed that the entire cross-walks and ramps are submerged and filled with pooled water and mud, which causes her wheelchair tires to lose traction, leaving her unable to traverse the ramps.  As a result, Clark was not able to access the boardwalk despite the new crossing.

In 2016, Clark tried to attend one of the Thursday Night Sights and Sounds events in downtown Chelsea with her friend, fellow plaintiff Brenda Baraniak.  The event features musical acts on ten stages arranged along M-52 (Main Street).  Clark attested that "[v]irtually every transition from each crosswalk to and from each curb ramp had an abrupt change in level, (large lips) that risked tipping our wheelchairs"; almost "every painted crosswalk had one or more divots, potholes, rips or other defects in the road surface that were tipping hazards"; and a "few times we had to go outside of the painted crosswalk, to find the least risky place to transition from the street onto or off of a curb ramp."  Clark stated that "[a]t one location, we abandoned the crosswalks and curb ramps entirely," and instead "both traveled in heavy vehicular traffic and used a commercial driveway apron to leave the street and enter onto the sidewalk, and later to leave the sidewalk and enter the traffic."  As a result, Clark and Baraniak were able to get close to only two of the performing stages, were unable to reach two others, and ended up giving up and going home without enjoying most of the festival.

As with Ms. Mote, Clark did not identify the specific intersections with the offending ramps.

### 3. Brenda Baraniak

Plaintiff Brenda Baraniak is paralyzed from the waist down and uses a wheelchair that she pushes by her own power. She has a device that lifts the wheelchair and stores it on top of her car when she travels, and her car is modified to use hand controls. Baraniak stated that she had not visited Chelsea or used any of the pedestrian crossings there before August 2014. However, sometime after July 2014, Baraniak believed her granddaughter had reached an age where she could enjoy the parades in Chelsea and decided to attend the Chelsea Community Fair and its associated parade along US-12. Baraniak described nearly verbatim the same difficulties encountered by plaintiff Clark during her visit to the US-12 parade route. She also described similar difficulties and a lack of access to the Lake Pierce Boardwalk via the new pedestrian crosswalk across US-12, and she related the same difficulties encountered while attempting unsuccessfully to attend the downtown music fair with Clark.

### 4. Karen and Merlyn Street

Plaintiff Karen Street lives in Chelsea, is a survivor of polio, and has trouble walking. In 2014 she had an orthotic brace made for her ankle to assist her, but she still has trouble ambulating. She can walk for short distances, but she uses a motorized scooter to get around most of the time, and as her condition has worsened in recent years she has relied on her scooter more and more. Before August 2015, she never had any reason to use the curb ramps or sidewalks along US-12. But in January 2017 a friend of hers moved into a retirement home across US-12 from the Lake Pierce Boardwalk, and Street attested that she wants to visit the boardwalk with her friend, but has been unable due to the same flooding and debris accumulation at the US-12 crossing which was described by other plaintiffs. Street also stated that in 2015 she attended one of the Thursday evening music

festivals along M-52 in Chelsea, and while trying to negotiate a particularly dangerous transition from a curb ramp her scooter tipped over into traffic along the street. Since that time Street and her husband have taken the dangerous — but in her view less risky — alternative of passing along the street among parked cars and passing traffic, rather than risk tipping over again on that particular curb ramp. However, even by that risky avenue Street was unable to reach most of the stages during the festival, due to the number of curb ramps that she found dangerously impassable.

Street attested that almost every transition from ramp to street or sidewalk along M-52 has large lips that cause her scooter almost to tip over, and she often is forced to go outside the painted crosswalks to find a place to safely enter or exit the ramp. Even when walking short distances, Street stated that she often has to turn sideways in order to safely traverse the ramps, due to the steep slopes and poor transitions, which increases her risk of falling.

Plaintiff Merlyn Street submitted a declaration generally corroborating his wife's account of her difficulties traversing the US-12 and M-52 curb ramps and sidewalks, which he also has had the same problems with as an elderly survivor of polio. Neither identified specific problematic intersections along US-12 or M-52

### 5. Lee Benton

Plaintiff Lee Benton attested that he moved to Ann Arbor in 2014, and in 2015 and 2016 he rode the WAVE bus from Ann Arbor to Chelsea, where his parents live. He has cerebral palsy, cannot use his legs, has limited use of his arms, and uses a powered wheelchair. He described problems similar to those encountered by Mote, Clark, Baraniak, and the Streets while traveling from his bus stop to the Chelsea summer fair and parade, and while attempting to access the

Thursday night summer music festivals; but he did not point out the specific intersections where the ramps were problematic.

### 6. Joanne Ladio

Joanne Ladio attested that she is the full-time caregiver for plaintiff Carlos Gray-Lion, and that the two have lived together in Chelsea since 1999. She attested to difficulties pushing Carlos's wheelchair on the pedestrian routes along US-12 and M-52, stating that she had similar difficulties as other plaintiffs with the US-12 crossing to the Lake Pierce Boardwalk. She also attested that in 2014, 2015, and 2016 she and Carlos only have been able to attend the one stage nearest to their home during the summer music festivals, due to the many (unspecified) impassable curb ramps along M-52.

### 7. Other Individual Plaintiffs

Plaintiffs Jennifer Kundak, who has difficulty walking, and J.N. (by his next friend), a minor who has spina bifida and uses a wheelchair and forearm crutches to ambulate, submitted similar declarations describing their difficulties traversing the same curb ramps discussed by the plaintiffs mentioned above.

### 8. Plaintiff Ann Arbor Center for Independent Living (AACIL)

Carolyn Grawi, director and CEO of plaintiff AACIL, submitted a declaration in which she attested that she is blind, cannot drive, and walks using a cane. AACIL provides services to disabled individuals that include information, peer mentoring, training in individual living skills, advocacy, and assistance with community transitions. Grawi was contacted in late 2015 or early 2016 by plaintiffs Mote, Clark, and Baraniak. She drove to Chelsea to meet with the plaintiffs, where she observed for the first time that many of the businesses along main street had inaccessible entrances,

and that much of the street parking in the City was inaccessible. Grawi referred the plaintiffs to their counsel of record for advice about their legal rights, and she "spent hours inspecting sidewalk, curb ramp and crosswalk barriers to access throughout Chelsea, which is in AACIL's service area."

Several weeks later, Grawi was driven to Chelsea to meet with City officials about the accessibility barriers she had encountered; evidently unsatisfied with the City's response, the AACIL board of directors later voted to file suit against the City under the ADA. While this lawsuit has been pending, Grawi has had to spend time answering discovery inquiries and attending a deposition, and her involvement in the case has diverted her from work that had to be covered by other employees. Grawi attested that "[d]ue to funding cuts, and layoffs, AACIL is stretched very thin," and "[a]ny time spent on the Chelsea matters is a drain, in people, resources and time that I and other employees would otherwise spend on other AACIL work." Grawi also attested that her organization's ability to negotiate with commercial businesses in Chelsea to persuade them to make their premises accessible is hampered because of the time and resources diverted to dealing with accessibility defects in the public way, and because Grawi must be "accompanied and assisted by a non-disabled person even to reach the establishments."

### B. The Chelsea Thoroughfares
#### 1. State Road 52 (M-52)

In 2003 defendant MDOT resurfaced the part of State Road 52 (M-52, a.k.a. "Main Street") that runs through the City of Chelsea. MDOT's representative also testified that the agency periodically "refreshes" painted pavement markings along the M-52 corridor, on an approximately five-year cycle, and that the agency also periodically "salvages" or "replaces" street signs along the road.

Beyond those preliminary and apparently undisputed facts, it was difficult to discern any coherent information that could be pertinent to the applicable construction standards from the record submitted by the plaintiffs relating to M-52. The plaintiffs attached to their response to MDOT's motion a vast catalog of inscrutable diagrams and photographs, which perhaps are meant to depict the dimensions and condition of numerous curb ramps at locations along M-52. However, unlike the description of conditions along US-12, the defects purportedly identified at those locations were not summarized in any affidavit by the plaintiffs' inspectors, and no deposition or other affidavit testimony was included to explain them. The plaintiffs also do not cogently summarize or identify the specific defects of those M-52 curb ramps with respect to particular regulations anywhere in their briefing.

After reviewing all of those exhibits, without the benefit of any testimonial guidance from the plaintiffs' inspectors or any explanatory briefing to illuminate the significance of the depictions, the Court could say that there appear to be some locations depicted in the exhibits that are in some degree of disrepair, but cannot draw any conclusions about what a factfinder could ascertain relating to any specific defects at those locations that contravene an applicable regulation.

The Court discussed that difficulty with the plaintiff's attorney at oral argument, and invited supplemental briefs that might cure the problem. However, the plaintiffs' brief fails to address the lack of information required by Federal Rule of Civil Procedure 56(c), regarding the supposed defects along the M-52 (Main Street) corridor. Contrary to the Court's direction, the plaintiffs refused to actually enumerate the defects at each of the sidewalk ramps, and instead cited only "one example" of purported defects, referencing the same inscrutable engineering sketches previously

submitted.  The plaintiffs' only explanation for their failure to produce an inventory of defects is that it would take a lot of pages to make such a list, so they apparently believed they should not try.

## 2. Old U.S. 12 (US-12)

In 2007, WCRC carried out the "Old U.S. 12 Resurfacing Project," which was referred to in project documents as being undertaken "in cooperation with the Michigan Department of Transportation."  The log stated that the "improvements covered by [it would be] constructed in accordance with the Michigan Department of Transportation 2003 standard specifications for construction," and it included drawings and specifications for, among other things, "sidewalk ramp details," "concrete sidewalks," and "concrete curb[s]."  The project log stated that "all sidewalk ramps" within the work zone would be "replaced and/or relocated with ADA compliant ramps."  An accompanying letter from WCRC officials stated that the County required a permit to be issued by the City for work to be performed within the City limits, before it could "submit a final engineering package to the Michigan Department of Transportation Local Agency Section."  That letter noted that the work would include "reconstruction of the sidewalk drops to become compliant with ADA requirements" at the intersections with Lane Street, Arthur Street, and Old Manchester Road. Subsequently, the WCRC entered into a contract with MDOT to procure financing for the project from MDOT.

On October 19, 2016, Derik Bollinger and Ray Schmidt, two superintendents of the City of Chelsea Public Works Department, inspected several of the intersections along US-12 that were included within the 2007 resurfacing project.  Bollinger and Schmidt stated in their affidavits that they observed that at the Wilkinson, Arthur, and Lane street "T" intersections, there were only two curb ramps placed at crossings of US-12, meaning that the ramps designated as "1" and "8"

according to the plaintiff's diagram were omitted (i.e., one ramp at the northwest corner of each intersection and one corresponding ramp at the southwest corner). They also observed that at the "+" or "plus" intersection with Taylor street, there also were only two ramps crossing Taylor, with ramps "4" and "5" omitted from that intersection. At Wilkinson Street, at ramps "4" and "5" crossing US-12, the superintendents observed "evidence of ponding water, such as staining and debris covering part of the detectable warnings and collected at the transition of each curb ramp to Old U.S. 12." At that location ramp "4" also "had a running slope of 10%." Similarly, at Lane Street they also observed evidence of ponding water, at ramps "2," "3," "4," and "5," and they noted that ramp "4" had a running slope of 9%. At Arthur Street, they noted evidence of ponding water at ramps "2," "3," and "4," and ramp "2" had a running slope of 10.4%. At ramps "4" and "5" they also observed a "3/4 to 1 inch abrupt change in level at the transition from the curb ramp to the street — an 'asphalt reverse lip.'"

At Taylor Street, they observed that curb ramps "1," "2," and "8" had evidence of ponding water, and ramps "6" and "7" (across Taylor Street) had "missing expansion joints leaving a gap in the surfaces approximately 1.5 inches wide and more than 1 inch deep for the entire widths of the ramps." They also noted a "hole in the asphalt approximately 1.5 inches deep and 7 inches wide" in the road surface crosswalk between ramps 6 and 7, and they recorded that ramps 2 and 7 had 1/2 inch "asphalt reverse lips."

Mark McCulloch of the WCRC confirmed at his deposition that the work during the 2007 project included removing two of the four curb ramps that previously had existed at Arthur and Lane Streets. McCulloch testified that the ramp locations were removed because there were some ramps in place on one side of the street with no "receiving" ramp on the other side, and because it was

determined that reducing the number of "conflict points" between cars and pedestrians along US-12 would improve safety.

## C.  Procedural History

The plaintiffs filed their putative class-action complaint seeking declaratory and injunctive relief against the local and state government defendants on April 28, 2016, followed by an amended complaint to correct procedural defects on August 4, 2016, and a second amended complaint on May 22, 2017.  The amended complaint alleges violations of ADA Title II (Count I) and the Rehabilitation Act of 1973 (Count II) against the City of Chelsea, the City's Downtown Development Authority, and MDOT.  The complaint also raises a congruent claim against the City of Chelsea only under Michigan's Persons With Disabilities Civil Rights Act (PWDCRA).  With leave granted, the City of Chelsea filed a third-party complaint against the WCRC, which the City contends has exclusive control over and responsibility for certain roadways within its city limits.

Defendant MDOT filed an answer to the original complaint and a motion for judgment on the pleadings; WCRC responded in similar fashion to the third-party complaint.  The plaintiffs later entered into a consent decree with the City of Chelsea, and they filed their second amended complaint naming WCRC as a principal defendant.

After discovery closed, defendants WCRC and MDOT filed their summary judgment motions.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under Rule 56, the party bringing the summary judgment motion has the initial burden of informing

the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the party opposing the motion contends facts are in dispute, she may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Nor may she "simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).

Instead, the opposing party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Those facts must be "established by evidence that will be admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing Fed. R. Civ. P. 56(e)(2)) If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

A.  ADA, Rehabilitation Act, and State Law
1.  The ADA and its Regulations

Title II of the ADA prohibits the exclusion of a "qualified individual with a disability" from "participation in" or enjoying the "benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.  It also prohibits "discrimination by any such entity."  *Ibid.*  "'Public entity' includes 'any state or local government' and 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'"  *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004) (quoting 42 U.S.C. § 12131(1)(A) & (B)).

Through section 204 of the ADA, Congress granted to the Attorney General the "authority to promulgate regulations to implement its provisions."  *Ibid.* (citing 42 U.S.C. § 12134).  One of those regulations, 28 C.F.R. § 35.151, governs construction and alteration of public facilities commenced after January 26, 1992.  When the alteration "could affect the usability of the facility," the alterations must be designed and constructed "in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities.'"  *Ibid.* (quoting 28 C.F.R. § 35.151(b)).  The regulations define the term "facility" to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."  28 C.F.R. § 35.104.

As the Court explained in its previous opinion in this case, "'To be "readily accessible," any part of a newly constructed or altered facility must be constructed in conformance with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, or with the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. Pt. 101-19.6, App. A.'"  *Mote*, 252 F. Supp. 3d at 649 (citing *Daubert v. Lindsay Unified Sch. Dist.*,

760 F.3d 982, 986 (9th Cir. 2014); 28 C.F.R. § 35.151(c)(1)-(3)).  The ADAAG is a set of regulations that set out, in comprehensive detail, the design specifics for structures and facilities to make them "readily accessible" to disabled persons.  The regulations also require a public entity to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."  28 C.F.R. § 35.133.

With respect to curb ramps, section 35.151(i) expressly requires that "(1) Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and "(2) Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways."  28 C.F.R. § 35.151(i).  The DOJ has interpreted this regulation to require that "[w]hen streets, roads, or highways are newly built or altered, they must have ramps or sloped areas wherever there are curbs or other barriers to entry from a sidewalk or path.  Likewise, when new sidewalks or paths are built or are altered, they must contain curb ramps or sloped areas wherever they intersect with streets, roads, or highways."  U.S. DOJ, ADA Title II Technical Assistance Manual II-6.6000 (https://www.ada.gov/taman2.html).

The ADAAG sets forth detailed specifications for the location and construction of curb ramps in Section 4.7 of the Guidelines (1991 version).  As an initial matter, the Guidelines define the term "accessible route" as "[a] continuous unobstructed path connecting all accessible elements and spaces of a building or facility."  ADAAG 3.4.  "Exterior accessible routes may include parking access aisles, curb ramps, crosswalks at vehicular ways, walks, ramps, and lifts."  *Ibid.*  The phrase "curb ramp" refers to "[a] short ramp cutting through a curb or built up to it."  *Ibid.*  "If an accessible

route has changes in level greater than 1/2 in (13 mm), then a curb ramp . . . shall be provided that complies with [ADAAG 4.7]." ADAAG 4.3.8. "Curb ramps complying with [ADAAG 4.7] shall be provided wherever an accessible route crosses a curb." ADAAG 4.7.1.

"Slopes of curb ramps shall comply with [ADAAG 4.8.2]." ADAAG 4.7.2. Section 4.8.2 specifies that "[t]he least possible slope shall be used for any ramp," "[t]he maximum slope of a ramp in new construction shall be 1:12," and "[t]he maximum rise for any run shall be 30 [inches]." ADAAG 4.8.2. "Transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes," and "[m]aximum slopes of adjoining gutters, road surface immediately adjacent to the curb ramp, or accessible route shall not exceed 1:20." *Ibid.* "The minimum width of a curb ramp shall be 36 [inches], exclusive of flared sides." ADAAG 4.7.3. "Surfaces of curb ramps shall comply with [section] 4.5." ADAAG 4.7.4. Section 4.5 covers "ground and floor surfaces" generally and states, among other things, that (1) "[g]round and floor surfaces along accessible routes and in accessible rooms and spaces including floors, walks, ramps, stairs, and curb ramps, shall be stable, firm, [and] slip-resistant"; (2) changes in level less than 1/4" may be "vertical and without treatment"; and (3) changes between 1/4 and 1/2" must be beveled and with a slope no greater than 1:2. ADAAG 4.5.1-4.5.2.

Curb ramps must "be located or protected to prevent their obstruction by parked vehicles," and ramps "at marked crossings shall be wholly contained within the markings, excluding any flared sides." ADAAG 4.7.8-4.7.9. "Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces." ADAAG 4.8.8.

## 2. The Rehabilitation Act

Section 504 of the Rehabilitation Act parallels the command of the ADA concerning accessibility to public facilities for persons with disabilities, but it applies only to "any program or activity receiving Federal financial assistance.'" *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (quoting 29 U.S.C. § 794(a)). "[T]he remedies, procedures, and rights available under Title II of the ADA parallel those available under [The Rehabilitation Act]." *Ability Center*, 385 F.3d at 905 & n.7 (citing 29 U.S.C. 794a(a)(2); *Barnes v. Gorman*, 536 U.S. 181, 189 n.3 (2002); *Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998)). Thus, the Sixth Circuit has explained that its "analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are 'quite similar in purpose and scope.'" *Babcock*, 812 F.3d at 540 (quoting *McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453, 459-60 (6th Cir. 1997)).

The regulations enacted under the Rehabilitation Act apply "to each recipient of Federal financial assistance from the Department of Transportation and to each program or activity that receives such assistance," and require that "all [] entities subject to section 504 shall design, construct, or alter buildings, or other fixed facilities, in conformance with appendices B and D of 36 C.F.R. part 1191, as modified by appendix A to part 37 of this title." 49 C.F.R. § 27.3. "The Rehabilitation Act has a set of standards nearly identical to the ADAAG called the Uniform Federal Accessibility Standards ('UFAS'). 41 C.F.R. pt. 101-19.6, app. A." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291 n.2 (5th Cir. 2012).

3. State Law

The state law counterpart to these two federal statutory mandates is the Michigan Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101, *et seq.* That enactment "'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'" *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)).

B. MDOT's Summary Judgment Motion

MDOT's legal position has evolved with each of the briefs it filed on its motion for summary judgment. In its final reply brief, filed after the Court issued its opinion on MDOT's and WCRC's Rule 12 motions, the MDOT argued that: (1) it is responsible for building and maintaining state roads such as M-52, but it is not responsible for any work done on Old U.S. 12, a county road, even if it served as a "funding conduit" for work done under the County's authority; (2) MDOT is not responsible for constructing or maintaining sidewalks, even if they run along a state road, because municipalities are responsible for building and maintaining sidewalks within their borders, (citing Mich. Comp. Laws § 103.1; 1963 Mich. Const. art. VII, § 29); (3) in any event, the plaintiffs have not identified any "sidewalk" that is defective that MDOT took upon itself to repair, and their evidence relates only to "curb ramps"; (4) the plaintiffs have not identified any intersection along M-52 that does not feature fully ADAAG-compliant curb ramps; and (5) the ADA does not require accessible on street parking to be located in any particular place, and under state law motorists are allowed to park along any public street where not otherwise prohibited, so the failure to construct accessible on-street parking in any particular spot does not violate any cognizable provision of the ADAAG.

In a supplemental brief, filed with the Court's permission, MDOT also raised a new argument that the State of Michigan's Eleventh Amendment sovereign immunity bars all of the plaintiffs' claims under ADA Title II, because (1) the failure to build curb ramps in full conformance with the ADAAG guidelines does not violate any fundamental constitutional guarantee secured by the Fourteenth Amendment, and (2) the Title II mandate for strict ADAAG compliance in all new construction is not otherwise valid because it was not a "congruent" and "proportional" response to any Congressional findings of widespread discrimination against the disabled by the states that informed Congress's passage of the ADA.

MDOT's sovereign immunity arguments have little impact on the ultimate disposition of this case, for a couple of reasons. *First*, although (subject to three exceptions, noted below) the Eleventh Amendment bars suits in federal court "in which [a] State or one of its agencies or departments is named as the defendant," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), even if the defendant prevails on its position that the Eleventh Amendment bars the ADA claims lodged against MDOT itself, the plaintiffs would be able to salvage their claims by the simple expedient of amending the complaint to drop the state agency and name its present highest official as a defendant instead. "[T]he Eleventh Amendment does not preclude a suit against [state official defendants named in their official capacities] for prospective injunctive relief." *McCormick v. Miami University*, 693 F.3d 654, 662 (6th Cir. 2012) (citing *McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000) ("The district court correctly determined that the Eleventh Amendment permits prospective injunctive relief, but not damage awards, for suits against individuals in their official capacities under 42 U.S.C. § 1983.")); *see also Ex parte Young*, 209 U.S. 123, 159 (1908).

*Second*, it is undisputed that the defendants received and used federal funds to construct all of the sidewalks and curb ramps in question, and, as a result, they were subjected to materially identical accessibility mandates under the Rehabilitation Act, which are coextensive with those imposed by the ADA. Neither defendant has raised any coherent argument to explain how it is not bound to abide by the Rehabilitation Act mandates, and MDOT concedes in a footnote that its entire elaborately briefed Eleventh Amendment argument is inapplicable to the Rehabilitation Act, and that it is not immune to claims brought under that authority. Def.

 MDOT's Supp. Brief [dkt. #75] at 10 n.1 ("MDOT recognizes that it is not immune to Plaintiffs' Rehabilitation Act claims.").

As the federal courts have long recognized, "Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act of 1973 [and] essentially extends coverage to state and local government entities that do not receive federal funds." *Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008). The courts "have therefore observed that '[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.'" *Ibid.* (quoting *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999)). The regulations enacted under the authority of the Rehabilitation Act apply "to each recipient of Federal financial assistance from the Department of Transportation and to each program or activity that receives such assistance," and require that "all . . . entities subject to section 504 shall design, construct, or alter buildings, or other fixed facilities, in conformance with appendices B and D of 36 C.F.R. part 1191, as modified by appendix A to part 37 of this title." 49 C.F.R. § 27.3. "The Rehabilitation Act has a set of standards nearly identical to the ADAAG called the Uniform Federal Accessibility Standards ('UFAS'). 41 C.F.R. pt. 101-19.6, app. A." *Greer*, 472 F. App'x at 291.

In yet another supplemental brief, MDOT attempts to advance the argument that the Rehabilitation Act's regulations are invalid *ab initio* because they never were submitted to the proper congressional authority for approval. That argument was not raised in any previous briefs that MDOT filed, and was mentioned in passing for the first time at oral argument. After that hearing, the Court allowed the parties to submit supplemental briefs, primarily to permit the plaintiffs to address their failure to support their arguments with specific references to the record. Although the Court allowed additional briefing to address items discussed at oral argument that were not addressed in earlier briefs, MDOT mistook that allowance as an invitation to submit what amounted to another summary judgment motion based on a new theory that contradicted a position it took in an earlier brief. The Court struck its latest brief for that reason; because the latest argument was not raised on a timely basis, it is deemed waived. *See, e.g., Piazza v. Aponte Roque*, 909 F.2d 35, 37 (1st Cir. 1990) (noting arguments raised for the first time at oral argument are deemed waived); *Sodexo Mgmt., Inc. v. Detroit Pub. Sch.*, 200 F. Supp. 3d 679, 694 (E.D. Mich. 2016) (holding that arguments "raised for the first time in a reply brief renders this argument waived") (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). MDOT has filed a motion to reconsider the order striking its last brief, but it has not identified a basis to overturn the Court's ruling. *See* E.D. Mich. LR 7.1(b)(2) ("A party must obtain leave of court to file more than one motion for summary judgment.").

*Third*, MDOT's sovereign immunity does not excuse it from potential ADA violations. There are three exceptions to Eleventh Amendment immunity: (1) when the state has waived its immunity by consenting to the lawsuit; (2) when Congress has abrogated the state's sovereign immunity; and (3) when the plaintiff seeks only prospective injunctive relief against a state official

from violating federal law. *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) (citing cases). The second exception applies to the present alignment of the parties in this case.

"Congress may abrogate the states' Eleventh Amendment sovereign immunity pursuant to the enforcement provisions of § 5 of the Fourteenth Amendment when Congress both 'unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.'" *Babcock*, 812 F.3d at 534 (6th Cir. 2016) (quoting *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)) (quotation marks and alterations omitted). "In other words, the ADA only applies to the states to the extent that the statute is enacted pursuant to a valid grant of Congress's authority." *Ibid.* As to the first element of the *Garrett* analysis, it is beyond dispute that "Congress has expressed an unequivocal desire to abrogate Eleventh Amendment immunity for violations of the ADA." *Ibid.* (citing 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter.")). However, "the Supreme Court has held that Congress's attempted abrogation is only valid in limited circumstances, depending upon the nature of the ADA claim." *Ibid.* To determine if a case fits one of those circumstances of Title II ADA claims, "the Supreme Court has set forth a three-part test:

> [D]etermine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."

*Ibid.* (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)).

As to the first element of the *Georgia* analysis, the Supreme Court has explained that courts must identify with some particularity the plaintiffs' rights that allegedly were invaded, which they

contend should be vindicated by enforcement of the ADA. That is so because, "[w]hile § 5 authorizes Congress to enact reasonably prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent." *Tennessee v. Lane*, 541 U.S. 509, 523-24 (2004). And as the Court observed, "difficult and intractable problems often require powerful remedies," but "strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Ibid.* (quotations omitted).

In this case, the plaintiffs testified that, as a result of the accessibility defects in the defendants' sidewalks and curb ramps, they have been denied equal access to the City's pedestrian thruways in order to get to public facilities and events, because they are unable to travel along the same paths taken by other pedestrians who are not disabled. Depriving a disabled individual of the ability to traverse the public spaces used by his or her fellow citizens certainly amounts to a severe burden on his or her participation in public life — perhaps among the most severe impairments that can be imposed. Title II was intended to "enforce a variety of . . . basic constitutional guarantees," *Lane*, 541 U.S. at 522, but the guarantee of the ability freely to travel in the public way is among the most fundamental of those. All of the other promises of equal access under the ADA "would be meaningless *if people who use wheelchairs were not afforded the opportunity to travel on and between the streets.*'" *Ability Center*, 385 F.3d at 911-12 (6th Cir. 2004) (quoting H.R.Rep. No. 101-485, pt. 2, at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 (emphasis added)).

As to the second element, the plaintiffs have not submitted sufficient evidence to establish that the alleged accessibility defects resulted in any invasion of their rights under the Fourteenth Amendment. They mount undeveloped arguments that they were deprived of their rights to engage in "commerce" and that their inability to travel around the City could impair their First Amendment

right of free association. But their testimony does not suggest plausibly any instances in which those fundamental constitutional rights were injured.

Therefore, the Court must determine whether "Congress'[s] chosen remedy for the pattern of exclusion and discrimination" that it observed was met with a legislative mandate that "was congruent and proportional to its object of enforcing the right of access . . . ." *Lane*, 541 U.S. at 531. The defendant contends that Congress did not identify any pattern of exclusion from public facilities when it enacted the ADA, but the *Lane* Court squarely held otherwise. "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524. "This pattern of disability discrimination persisted despite several federal and state legislative efforts to address it." *Id.* at 526. And "[t]he conclusion that Congress drew from [the] evidence is set forth in the text of the ADA itself: '[D]iscrimination against individuals with disabilities persists in such critical areas as . . . education, *transportation*, communication, *recreation*, institutionalization, health services, voting, and *access to public services*.'" *Id.* at 529 (quoting 42 U.S.C. § 12101(a)(3)). "This finding, together with the extensive record of disability discrimination that underlies it, *makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation*." *Ibid.* Moreover, as the district court noted in *Mason v. City of Huntsville, Ala.*, No. 10-02794, 2012 WL 4815518 (N.D. Ala. Oct. 10, 2012), Congress was particularly concerned with the isolation from public life that resulted from accessibility barriers in the public way:

> In the House Report published in conjunction with the 1990 enactment of the ADA, Congressional inquiries and testimony showed that, before the ADA, "it [was] clear that an overwhelming majority of individuals with disabilities lead isolated lives." H.R. Rep. 101-485, pt. 2, at 34 (alteration supplied). The report stated that

"[d]iscrimination also includes harms resulting from the *construction of transportation, architectural, and communication barriers*." *Id.* at 33 (emphasis supplied). The report labeled transportation as "the linchpin which enables people with disabilities to be integrated and mainstreamed into society," and recognized that "accessible transportation . . . promotes the self-reliance and self-sufficiency of people with disabilities. *People who cannot get to work or to the voting place cannot exercise their rights and obligations as citizens*." *Id.* at 37.

*Mason*, 2012 WL 4815518, at *10 (emphasis added and in original).

The remaining question, therefore, is "whether Title II is an appropriate response to this history and pattern of unequal treatment," and in particular whether the mandate of strict compliance with the ADAAG specifications in the case of new constructions or alterations after 1992 was a congruent and proportional response to an identified pattern of denial of equal access by the disabled to avenues of travel in the public way. Here, as the *Lane* court observed, "[t]he remedy Congress chose is [] a limited one," where it mandated only that "the States [] take reasonable measures to remove architectural and other barriers to accessibility." 42 U.S.C. § 12131(2). Moreover, the states are allowed the flexibility to work around obstacles "in the case of older facilities, for which structural change is likely to be more difficult," where "a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Id.* at 532 (citing 28 C.F.R. § 35.150(b)(1)). But "[i]n the case of facilities built or altered after 1992," where the cost of incorporating new accommodations likely will be nominal, "the regulations require compliance with specific architectural accessibility standards." *Ibid.* (citing 28 C.F.R. § 35.151); *Venus v. Seville Food, LLC*, No. 14-2476, 2017 WL 2364192, at *12 (D.N.J. May 31, 2017) ("'Because it costs far less to incorporate accessible design into the planning and construction of new buildings and of alterations as compared to retrofitting existing structures, a higher standard of "readily

accessible to and usable by" persons with disabilities has been adopted in the ADA for new construction and alterations.'" (quoting H.R.Rep. No. 101–485(III) at 60, reprinted at 1990 U.S.C.C.A.N. 445, 483)).

The ADA's flexible imperative, requiring the greatest extent of accommodations only in cases where the cost of compliance would be the least, was an eminently "congruent" and "proportional" response to the historical pattern of isolation of the disabled from public life that Congress found had resulted from architectural obstacles that economically can be eliminated with proper attention to design details in new construction. *Mason*, 2012 WL 4815518, at *11 ("Considering the clear and persistent history of discrimination against persons with disabilities and the Congressional recognition of the importance of accessible streets, sidewalks, and parking areas, this court finds that Title II is a congruent and proportional and, therefore, constitutional exercise of Section 5 enforcement power as applied to equal access to publically-maintained sidewalks, curb ramps, and parking areas.").

Congress's abrogation of the states' sovereign immunity in Title II of the ADA was a valid exercise of its remedial power under setcion 5 of the Fourteenth Amendment. MDOT's Eleventh Amendment defense here fails.

But the plaintiffs are not home free with that determination. Far from it. Their brief responding to MDOT's summary judgment motion does not identify issues of fact for trial under the prescriptions of Rule 56 on any specific sidewalk or curb ramp feature along M-52. Their brief consists mostly of large segments of language copied from the Court's previous opinion in this case, which were included in the plaintiffs' papers nearly verbatim, with no attribution. The plaintiffs also included exhibits denominated as "fact sets," which comprise nothing more than argumentative

summaries of certain affidavits and other exhibits depicting the conditions in the defendant's right of way. However, their briefing did not include anywhere an explanation of how any specific defects identified in the curb ramps constructed by MDOT violated provisions of the ADAAG. They have failed to put forth any coherent evidentiary presentation to identify what specific defects they believe exist, at which specific curb ramps along M-52 that they contend are defective. Certainly the testimony of the individual plaintiffs suggests that some of the curb ramps on Main Street have dangerous defects that made them difficult to navigate and obstructed the plaintiffs' ability fully to access and enjoy public events (such as the Thursday evening music festivals). However, none of that testimony identifies with any specificity what ADAAG-violating aspects of the design or construction of any particular curb ramps led to those difficulties that the plaintiffs encountered. Moreover, there is no evidence in the record tending to suggest that MDOT constructed or altered any of those ramps after 1992, or identifying which ramps the agency constructed or altered that now have cognizable defects.

In their briefing the plaintiffs rely solely on general citations to a prolix, undifferentiated mass of inscrutable technical diagrams and scrawlings, which they contend illustrate numerous instances of ADAAG violations. That is insufficient. The mere reference to those technical drawings, inviting the court to cull through them in search of a fact question, "falls well short of 'direct[ing] the court's attention to those specific portions of the record upon which [the plaintiff sought] to rely to create a genuine issue of material fact." *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 500 (6th Cir. 2017) (citing *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007)). This Court is not charged with the responsibility of constructing the plaintiffs' arguments for them, from unannotated documents presented to the Court *en masse*. The court of appeals "never

required such advocacy by a district court . . . ." *Ibid.* (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 410 (6th Cir. 1992) (holding that a district court is not obligated to "comb the record from the partisan perspective of an advocate for the non-moving party")).

The plaintiffs have utterly failed to point out for the Court which portions of those exhibits correlate to what specific ADAAG violations that they allege. They have not met their burden under Rule 56. Fed. R. Civ. P 56(c)(1) ("A party *asserting that a fact cannot be or is genuinely disputed must support the assertion* by: (A) *citing . . . particular parts of materials in the record*, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) s*howing that the materials cited do not establish the absence or presence of a genuine dispute*, or that an adverse party cannot produce admissible evidence to support the fact.") (emphasis added).

Calling that defect to the plaintiffs' attention at oral argument, the Court invited plaintiffs' counsel to address the problem in a supplemental brief. To tame the impenetrable record they submitted, the Court suggested that the plaintiffs identify those specific curb ramps along M-52 that they contend are defective, stating (1) the exact location of each allegedly defective ramp; (2) the defects identified in each ramp, with pinpoint citations of exhibits in the record evidencing those defects, and citations of the specific ADAAG provision that the plaintiffs contend was violated by each defect; and (3) any evidence in the record tending to show that each of the ramps complained of was built or modified by defendant MDOT, and when the construction or alteration of the ramp occurred.

The plaintiffs have not capitalized on that opportunity. Contrary to the Court's direction, the plaintiffs refused actually to enumerate the defects at each of the sidewalk ramps, and instead cited only "one example" of purported defects, referencing the same inscrutable engineering sketches previously submitted. The plaintiffs' only explanation for their failure to produce an inventory of defects is that it would take a lot of pages to make such a list, so they did not do it.

There also are two other major problems with the mass of materials submitted in support of the plaintiffs' response, which were not addressed at all in the plaintiffs' supplement. One is that the documents they submitted are unauthenticated by any accompanying affidavit testimony by anyone who was involved in producing them, at least with respect to M-52. Nor were they accompanied by any comprehensible summary of defects correlating the discrete measurements with identifiable ADA Guideline transgressions. Such affidavits or declarations are necessary to show that the documents would be admissible at trial. *See Alexander*, 576 F.3d at 558 (noting that "the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence *that will be admissible at trial* to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary") (emphasis added).

A second problem is that the plaintiffs' documents probably would not be admissible even if they were authenticated and properly summarized so that the Court could understand them. They obviously represent information collected by parties to this litigation, for the purpose of supporting their positions, which are materially adverse to defendant MDOT. Those documents likely amount to inadmissible hearsay statements, not subject to any apparent exception. *See* Fed. R. Evid. 801(c). Although they might be fodder for properly documented and disclosed expert opinion testimony about the sidewalk conditions via Rule 702, no such testimony has been submitted in opposition to

the summary judgment motion, and the documents themselves likely would not be admissible. Therefore, they do not suffice to oppose MDOT's summary judgment motion. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007) (noting that "'evidence submitted in opposition to a motion for summary judgment must be admissible'") (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)).

The plaintiffs' claims against MDOT concerning the M-52 corridor must be dismissed because the plaintiffs have failed to submit adequate, prospectively admissible information to establish the existence of any defects in the sidewalks along that route, which violate any of the regulations enacted under the ADA or the Rehabilitation Act. The record does not establish a material fact question for trial. Therefore, MDOT's motion for summary judgment will be granted.

## C.  WCRC's Motion for Summary Judgment

In its motion for summary judgment, including an amended reply brief filed after the plaintiffs filed their response, defendant WCRC argues that: (1) the Sixth Circuit's decision in *Babcock v. Michigan* inevitably points to the conclusion that sidewalks are not "services" within the meaning of the ADA and therefore not subject to its regulations; (2) even if the Court finds that sidewalks are a "service," any such "service" must be viewed in its entirety, "the entire system of sidewalks would be the service, and the plaintiffs would have to show that they were denied meaningful access to that system; (3) none of the plaintiffs testified at their depositions about any place they were unable to get to via the pedestrian routes along Old US-12; (4) the DOJ regulations unlawfully "impose obligations on public entities that are not imposed by Title II," where they require "that facilities be 'to the maximum extent feasible . . . constructed [or altered] in such manner that the facility is readily accessible to and usable by individuals with disabilities,'" (quoting

28 C.F.R. 35.150(a)); (5) as to the placement of new curb ramps that do not already exist, the road commission must be allowed discretion to decide what locations are safe for pedestrians to cross, and the agency should not be required to place crosswalks (and therefore curb ramps) at unsafe or impractical locations; and (6) all of the alleged deficits in the existing ramps based on their present condition are issues of "maintenance," not "construction"; maintenance is the obligation of the local municipality under state law.

WCRC also asserts that the plaintiffs' accessibility claims are untimely under the applicable three-year statute of limitations. Finally, WCRC argues that plaintiff AACIL lacks organizational standing to participate in this lawsuit because its executive director could not identify at her deposition any financial harm suffered by the organization as a result of the alleged discrimination, and she admitted that the organization does not have "members" as such on whose behalf the AACIL could pursue the claims raised in this case.

### 1. Sidewalks are "Facilities" Under the ADA

Defendant WCRC argues with great vigor about the purported distinction between "services" and "facilities," contending that sidewalks are not "services," and therefore are beyond the reach of Title II of the ADA. However, the distinction is of little consequence, since sidewalks certainly are "facilities" under the plain language of the ADA, and it is beyond dispute that the ADAAG guidelines promulgated under the ADA that govern the construction of public facilities built or altered after 1992 therefore apply to them.

The term "facility" is defined under the applicable ADA regulations to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, *roads*, *walks*, passageways, *parking lots*, or *other real or personal property*, including the site where

the building, property, structure, or equipment is located." 28 C.F.R. § 35.104. The defendant's roadway, the sidewalks adjoining it which the defendant built or altered, and the curb ramps connecting them all plainly qualify as "facilities" under that definition. And the ADA regulations also plainly require that any "alterations of facilities commenced after January 26, 1992, 'by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities.'" *Ability Center*, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b)). As noted above, ready accessibility requires new construction or alterations to be ADAAG-compliant. *Mote*, 252 F. Supp. 3d at 649 (citing *Daubert*, 760 F.3d at 986; 28 C.F.R. § 35.151(c)(1)-(3)).

Moreover, it has been accepted by federal courts for more than two decades that ADA Title II imposes an affirmative mandate on public entities to ensure that facilities newly constructed or altered after 1992 comply with the ADAAG specifications. *Lane*, 541 U.S. at 532 ("In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards") (citing 28 C.F.R. § 35.151 (2003); *Ability Center*, 385 F.3d at 913 ("In conclusion, § 202 of Title II does not merely prohibit intentional discrimination. It also imposes on public entities the requirement that they provide qualified disabled individuals with meaningful access to public services, which in certain instances necessitates that public entities take affirmative steps to remove architectural barriers to such access in the process of altering existing facilities. 28 C.F.R. § 35.151 is a regulation adopted by the Attorney General at Title II's express direction that effectuates this aim."); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) ("In keeping with our precedent, maintaining public sidewalks is a normal function of a city and without

a doubt something that the [City] 'does.'  Maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II." (quotations and citations omitted)); *Johnson*, 151 F.3d at 570 ("Congress gave the Attorney General the task of developing regulations to implement Title II.  Because of this express delegation, these regulations are entitled to 'controlling weight, unless they are arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984)). Finally, as noted above, the UFAS guidelines promulgated under the Rehabilitation Act also impose materially identical architectural requirements for all construction carried out with federal funding by any state or local entity, and it is undisputed here that all of the sidewalks and curb ramps targeted in this case were built with federal funds.

## 2. Sidewalks are "Services" Under the ADA

Even if the sidewalks at issue were not "facilities" subject to the ADA, the program of building and maintaining sidewalks certainly is a "service" provided by the defendant by any coherent interpretation of that term.  No decision of the Supreme Court or any other federal court that was cited by the parties has held otherwise.  And in the Fifth Circuit's decision in *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011), the court of appeals squarely confronted the question and held that sidewalks do count as "services" for the purposes of ADA Title II.

WCRC's contrary argument is based on a strained reading of *Babcock v. Michigan*.  But the court of appeals in that case avoided the question whether "sidewalks" are "services," when it considered whether other features of an existing public building such as "handrails" could be construed to be services subject to Title II.  *Babcock*, 812 F.3d at 539 n.5 (noting that handrails are not "design features" that "satisfy a 'general demand' for 'safe transportation' in the same way that

-34-

a sidewalk does, " and acknowledging that it was "hard-pressed to conclude that [handrails] qualify as 'services,' like sidewalks under the [*Frame*] majority's approach"); *see also id.* at 543 ("While the majority relies substantially on the reasoning of the *Frame* dissent, the majority in this case carefully notes ways in which the case of sidewalks may be different from the building designs before us. *Ante*, at 538 n.5. Our decision today thus does not necessarily control a future case involving sidewalks.") (Rogers, J., concurring).

Moreover, this Court explicitly rejected WCRC's position on this issue on the previous opinion on the Rule 12 motions:

> Any sensible reading of ADA Title II compels the conclusion that maintaining public pedestrian thoroughfares for citizens to get around a city — and access the many public services and businesses located within — is the archetypal example of the most fundamental of public services. Inaccessible sidewalks are, in fact, the single most readily conceivable example of a basic obstacle to accessibility that comes to mind when considering the purpose that animates the ADA, which is to eliminate obstacles to the full enjoyment of public life by disabled citizens. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) ("To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life . . . ."). It is simply common sense: If disabled pedestrians cannot access the sidewalks, then they can hardly access anything else that a city has to offer.

*Mote*, 252 F. Supp. 3d at 654.

### 3. Denial of "Services"

As noted below, there is evidence in the record identifying the specific ADAAG-violating defects at several specific sidewalk intersections along Old US-12. The plaintiffs also have alleged adequately that they were denied "meaningful access" to the service provided — or supposed to be provided — by the defendant's construction of those sidewalks, because they have pointed to specific instances when they were prevented from accessing public events such as the City's summer parade, or denied access to a public venue such as the Lake Pierce Boardwalk, due to the defects in

the curb ramps along US-12.  Two of the plaintiffs even identified one instance where they were forced at great risk to traverse their intended route along US-12 by traveling along the roadway in their wheelchairs, at considerable risk due to the passing traffic, and with a "police escort," because they could not safely navigate the curb ramps along their route.  That presentation certainly suffices to suggest that the plaintiffs have been denied "meaningful access" to the service offered by a properly constructed roadside pedestrian walkway.

### 4.  Specific Defects

Although the plaintiffs' factual presentation in response to WCRC's summary judgment motion is not much more elucidating than its response to MDOT's motion, the plaintiffs did attach affidavits from Derik Bollinger and Ray Schmidt, two superintendents of the City of Chelsea Public Works Department, who inspected several of the intersections along US-12.  They reported their observations of those intersections and some measurements of their features.  By applying what appeared to be the pertinent portions of the ADAAG to those observations, the Court  was able to reach its own conclusions on those points.

The plaintiffs have identified at least three defects in the curb ramps at several of the intersections between sidewalks and the roadway on US-12, and those defects sufficiently suggest that the curb ramps in question are not compliant with relevant provisions of the ADAAG.  Among other things, the plaintiffs' inspectors stated their observations, based on an October 2016 inspection of several intersections, that several of the ramps within the scope of the work done in 2007 featured defects such as (1) running slopes exceeding the 1 in 12 or 8.33% maximum allowed by the ADAAG specifications, ADAAG 4.8.2 ("The maximum slope of a ramp in new construction shall be 1:12."); (2) transitions or "lips" at the transition from the ramp to the sidewalk exceeding the

maximum allowable untreated vertical deviation of 1/2 inch, *see* ADAAG 4.3.8; 4.5.1-4.5.2; and (3) propensity for the ramps to allow water to accumulate, resulting in obstructive accumulations of dirt, debris, mud, and grass, *see* ADAAG 4.8.8 ("Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces.").

The defendant contends that there is "no evidence" that the curb ramps in question were not fully ADA-compliant as built. But of course that position necessarily disregards the evidence that they are not compliant now, and, in the absence of any evidence to the contrary, a factfinder fairly could infer that the curb ramps are too steeply sloped, obstructed by dangerous asphalt protrusions, and prone to accumulate water because they were designed and constructed to be so. And the defendant has not offered any evidence conclusively to rebut that inference.

The Plaintiffs have met their obligation under Rule 56 to establish a material fact issue for trial.

### 5. Eliminated Curb Ramps

The plaintiffs also complain of one defect in particular at several intersections, which does not comprise a violation of any ADAAG standard on point: the alleged "omission" of one pair of ramps at some intersections. The plaintiffs contend that the "omission" of a ramp to transition from one of the two sidewalks along a side street that intersects with US-12 is non-ADAAG-compliant. But they have not pointed to any ADAAG specification purporting to control the number or orientation of ramps at an intersection. Instead, the pertinent regulations merely require that (1) "[n]ewly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and (2) "[n]ewly constructed or altered street level pedestrian walkways must contain

curb ramps or other sloped areas *at intersections to streets, roads, or highways*." 28 C.F.R. § 35.151(i) (emphasis added).

In this case, it is apparent that the configuration of the intersections in question does, in fact, include ramps at each spot where a sidewalk "intersects" a roadway. In those locations where ramps were omitted, the sidewalk in question terminates early, into the side of a perpendicular sidewalk running along US-12, and does not extend to the roadway. The plaintiffs have not pointed to any authority in the ADAAG or elsewhere mandating that the defendant construct sidewalks so that they intersect with a roadway at any particular point. Instead, all that the regulations require is that where a sidewalk does intersect with a road, a ramp must be installed. In this case that obligation appears to be fulfilled at all of the locations in question.

### 6. Construction vs. Maintenance

The defendant contends that, even if the sidewalks that it built were defective according to the ADDAG, it is not liable for their present condition because the issues identified are caused by lack of "maintenance" rather than as a consequence of improper "design" or "construction." But the defendant has not offered any evidence to substantiate its position that the sidewalks properly were designed and constructed in the first instance. Instead, it merely posits, without any supporting evidence, that its efforts during the 2007 reconstruction project were ADA-compliant, and it invites the Court to conclude that the defects that now exist must be due to lack of maintenance of the curbs and sidewalks, which it contends is exclusively the responsibility of the City after the construction was completed. The defendant points out that state law assigns to the City the responsibility of maintaining sidewalks within its borders. Mich. Comp. Laws Ann. § 691.1402a(1) ("A municipal

corporation in which a sidewalk is installed adjacent to a municipal, county, or state highway shall maintain the sidewalk in reasonable repair.").

However, that statute does not answer in the first instance the question whether the offending curb ramps are defective because they were defectively designed and constructed, or inadequately "maintained." And the present record is insufficient for the Court to decide the issue as a matter of law. As between the City and the County, the decision which is liable, and to what extent, for the identified defects will have to await the development of an adequate record on those points at a trial before the Court. WCRC is not entitled to a judgment as a matter of law on that point.

## 7. Statute of Limitations

Accepting the defendant's premise that the applicable statute of limitations for the ADA claims here is three years, it is apparent from the record that the plaintiffs claims all are timely because all of them specifically alleged that they first encountered the accessibility defects described in the complaint within three years before this action was filed.

"Federal law . . . governs when the limitations period begins to run, that is, when a claim accrues." *Helm v. Eells*, 642 F. App'x 558, 561 (6th Cir. 2016) (citing *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015)). "Under federal law, a claim accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Ibid.* "A plaintiff has 'reason to know' of an injury if he or she 'should have discovered it through the exercise of reasonable diligence.'" *Ibid.* "This is an objective inquiry, which looks 'to what event should have alerted the typical lay person to protect his or her rights.'" *Ibid.*

Nothing in the record suggests that any of the plaintiffs knew or had reason to know of any curb ramp defects in the sidewalks along US-12 or M-52 more than three years before this civil action was commenced.

## 8.  AACIL's Standing

Standing is required in order to confer subject matter jurisdiction upon federal courts under Article III of the Constitution.  It is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The Supreme Court has stated that the standing requirement "limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)).

One of the three components necessary to establish standing to sue under Article III is the demonstration of an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (stating that a plaintiff also must show that the injury is "traceable" to the defendant's conduct, and the injury likely will be "redressed by a favorable judicial decision").  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Ibid.* "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Ibid.*

An organization may have "associational standing" to sue on behalf of its members, "which exists if an association's members have standing; if the interests at stake are relevant to the

organization's purpose; and if the claims and relief do not require the participation of individual members." *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000)). However, "[i]n addition to suing on behalf of its members, an entity may sue 'on its own behalf because it has suffered a palpable injury as a result of the defendants' actions.'" *Northeastern Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2002) (quoting *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002)).

The record before the Court adequately establishes that AACIL has standing to proceed on its own behalf in this litigation, regardless of whether it has "associational standing" to proceed on behalf of any of its individual disabled clients. The testimony of its CEO establishes that the organization has suffered by having to divert its resources toward attempts to secure ADA compliance by the defendants, and that diversion of resources has impacted its capacity to provide the range of other services that it offers to disabled persons, including education, counseling, and advocacy. On similar facts, the Supreme Court has found that an advocacy organization for the homeless had standing to proceed against the defendants in a discrimination action, where its complaint alleged that the organization had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," and that the organization "had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (quotation marks and alterations omitted). As the Court explained:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's

activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests. We therefore conclude . . . that in view of HOME's allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.

*Havens Realty*, 455 U.S. at 379 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

AACIL's executive director testified to circumstances that rendered the injury adequately particularized, where she explained that AACIL's resources have been diverted from its usual mission as a result of its participation in pre-litigation advocacy relating to the precise accessibility defects alleged by the individual plaintiffs in this case, and that the burden only has increased due to the defendants' resistance in the course of this litigation. And contrary to the defendants' contention, there is no threshold of "significance" of the injury to the organization that must be exceeded to render the harm sufficiently concrete under Article III. The Supreme Court has held that even unquantifiable and intangible harms may qualify as injuries in fact, and, as in the Court held in *Havens*, the impairment of the organizations operations needs only to be "perceptible" to suffice. *Havens*, 455 U.S. at 379; *see also Spokeo*, 136 S. Ct. at 1549;

### D. City of Chelsea's Summary Judgment Motion

The City of Chelsea has moved for summary judgment on its third-party complaint against WCRC, alleging that it is entitled as a matter of law to a declaration that WCRC is liable for the condition of any sidewalks or curb cuts within the US-12 right of way. However, as noted above, the state of Michigan imposes an affirmative duty by statute on *the City* to maintain sidewalks within its boundaries. *See* Mich. Comp. Laws Ann. § 691.1402a(1). The ADA regulations also impose an express requirement on a responsible public entity to "*maintain in operable working condition those features of facilities and equipment that are required to be readily accessible* to and usable by

persons with disabilities by the Act or this part." 28 C.F.R. § 35.133(a) (emphasis added). As between the City and the County, the present evidentiary record is insufficient to allow the Court to hold as a matter of law that the City has no liability for maintenance of the sidewalks in question, if, in fact, some of the present accessibility defects are due to deterioration of ADA-compliant construction over time, coupled with a lack of maintenance, instead of defective construction or design.

Moreover, the City cannot escape liability for the condition of the sidewalks and curb ramps merely because it was the County and not the City that carried out the original work, because the ADA regulations impose obligations on a public entity to ensure that accessibility features are incorporated and that the ADAAG specifications are complied with any time that a public facility is altered or newly constructed, after 1992, "'*by, on behalf of, or for the use of a public entity* in a manner that affects or could affect the usability of the facility or part of the facility'" *Ability Center*, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b)) (emphasis added). The "project log" and the letter regarding the permit process that were submitted by defendant WCRC plainly suggest that the City was involved at the very least in issuing required permits to allow the project to proceed, and it is a fair inference from the record that the sidewalks and curb ramps were constructed either "on behalf of" or "for the use of" the City, despite the funding of the project with state and federal funds and the handling of the work by the County authority. And the City has not pointed to any authority suggesting that it cannot be held jointly liable with the County for any resulting ADA defects in the sidewalks and curb ramps under those circumstances.

## III.

Although the sovereign immunity defenses asserted by defendant MDOT lack merit, the plaintiffs have not offered evidence to satisfy their burden under Federal Rule of Civil Procedure 56(c) of demonstrating a material fact issue for trial. Their claims against MDOT, therefore, fail as a matter of law. MDOT has not offered good reason for the Court to reconsider its order striking its latest brief; its motion for reconsideration will be denied. Although the plaintiffs have met their Rule 56(c) burden on most of their claims against defendant WCRC, they have not demonstrated an entitlement to relief for their claim that certain curb ramps along Old U.S. 12 were eliminated during reconstruction. That claim will be dismissed. Fact disputes preclude summary judgment for the City of Chelsea on its third-party complaint against WCRC.

Accordingly, it is **ORDERED** that defendant Washtenaw County Road Commission's motion for summary judgment [dkt. #48] is **GRANTED IN PART AND DENIED IN PART**. The plaintiffs' claims based on the alleged elimination of a pair of curb ramps at some intersections is **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

It is further **ORDERED** that defendant Michigan Department of Transportation's motion for summary judgment [dkt. #50] is **GRANTED**. The plaintiffs claims against defendant MDOT are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that defendant Michigan Department of Transportation's motion for reconsideration [dkt. #94] is **DENIED**.

It is further **ORDERED** that the City of Chelsea's motion for summary judgment [dkt. #49] is **DENIED**.

It is further **ORDERED** that the parties shall appear before the Court for a status conference

to discuss further case management deadlines on **Wednesday, January 17, 2018 at 10:00 a.m.**

                                    s/David M. Lawson
                                    DAVID M. LAWSON
                                    United States District Judge

Dated:   January 2, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 2, 2018.

                    s/Susan Pinkowski
                    SUSAN PINKOWSKI