UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAUNA M. MOTE, DEBORAH CLARK,
CARLOS GRAY-LION, BRENDA BARANIAK,
KAREN STREET, MERLYN STREET,
LEE BENTON, by his next friends RONALD M.
BENTON and MARION BENTON, J.N., a minor,       Case Number 16-11546
by his next friends DANIEL and MARY JANE       Honorable David M. Lawson
NELSON, ANN ARBOR CENTER FOR
INDEPENDENT LIVING, INC., and
JENNIFER KUNDAK,

                Plaintiffs,

v.

CITY OF CHELSEA, CHELSEA DOWNTOWN
DEVELOPMENT AUTHORITY, and
WASHTENAW COUNTY ROAD COMMISSION,

                Defendants,

and

CITY OF CHELSEA,

                Third-party plaintiff,

v.

WASHTENAW COUNTY ROAD COMMISSION,

                Third-party defendant.

_____/

## <u>OPINION AFTER TRIAL</u>

This case concerns the sidewalks, curbs, and intersections in the City of Chelsea, Michigan,

and their accessibility to persons with disabilities. In a second amended complaint, the plaintiffs

— Shauna Mote and several other disabled individuals, joined by the Ann Arbor Center for

Independent Living — allege violations of the Americans With Disabilities Act (ADA), the Rehabilitation Act, and Michigan's Persons With Disabilities Civil Rights Act, based primarily on the condition of certain sidewalk curb ramps within the City of Chelsea. The individual plaintiffs are disabled persons who live, work, or frequently travel to and within the City of Chelsea, Michigan, and who each require the use of a wheelchair, braces, cane, or other assistive devices in order to get around. Plaintiff Ann Arbor Center for Independent Living is an association that represents disabled persons such as the plaintiffs throughout southeastern Michigan, including in Chelsea. They contend in their second amended complaint that the public streets and sidewalks in the City of Chelsea recently have become less than fully accessible to them due to City approvals of renovations by private businesses adjacent to public sidewalks and streets making those facilities inaccessible. They allege that the City of Chelsea and its Downtown Development Authority (DDA), along with the Michigan Department of Transportation (MDOT) and the Washtenaw County Road Commission (WCRC), have created or facilitated violations of the ADA within certain public pedestrian areas in the City by allowing businesses to renovate storefronts without including appropriate accessibility measures, and by removing previously constructed physical accommodations for wheelchair users, such as curb ramps at some intersections.

On May 22, 2017, the plaintiffs filed their second amended complaint, alleging violations of ADA Title II (Count I) and the Rehabilitation Act of 1973 (Count II) against the City of Chelsea, the City's Downtown Development Authority, and MDOT. The complaint also raises a congruent claim against the City of Chelsea only under Michigan's Persons With Disabilities Civil Rights Act (PWDCRA). With leave granted, the City of Chelsea filed a third-party complaint against the WCRC, which the City contends has exclusive control over and responsibility for certain roadways

within its city limits. The plaintiffs later entered into a consent decree with the City of Chelsea, and they filed their second amended complaint naming WCRC as a principal defendant.

After motion practice resulted in the dismissal of the case against the MDOT, realigned the parties, and narrowed the issues, the case came on for trial on May 29, 2018 before the Court sitting without a jury. Fourteen witnesses testified (four by deposition) and the Court received 73 exhibits. Afterward, the parties submitted proposed findings of fact and conclusions of law.

The disputed trial issues concerned the construction of the curb ramps installed at six intersections along a stretch of Old US-12 in the southern part of Chelsea, with the main focus on four of those intersections. The parties's exhibits throughout the case have included drawings and diagrams of the intersections, which use a "Ramp Location Index." That index identifies each intersection's potential ramp location with ordinal numbers "1" through "8," beginning with the northwest corner of an intersection — ramp "1" is the south-facing location — then proceeding clockwise until the southwest corner, with "8" being the north-facing location. (In the case of a "T" intersection, at least two of the ordinal locations would be inapplicable.). The Court will continue to use those designation here.

The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52(a)(1), based on the record evidence, followed by its application of the governing law.

## I. Factual Findings
### A. The Plaintiffs

Shauna Mote, a 35-year Chelsea resident, lost both legs in an automobile accident in February 2005. She uses a wheelchair and a scooter. She rarely uses her prosthetics to ambulate. For transportation, Ms. Mote is able to use a van by transferring from the wheelchair to the vehicle, for which she must maintain her upper body strength.

Ms. Mote described her experiences going to events in Chelsea and navigating the sidewalks and intersections along Old US-12. When she attended parades in 2016, she parked in a handicap-accessible lot, passing through the parking lot to the south side of Old US-12 to cross over at Manchester Street. She described the curb ramp at the Manchester Street intersection as steep with a large crack at the bottom and a big asphalt "lip" where the ramp joins the street. The ramp has a cross-slope, causing difficulty proceeding straight down. There is a pothole in the crosswalk. On a different day, her front caster became lodged in a crack in the sidewalk ramp.

On another occasion, her companion, Debra Clark, also wheelchair bound, encountered accessibility difficulty when her power wheelchair became mired in the mud and grass at one of the ramps at the intersection of Old US-12 and Taylor Street. She described similar debris and growing grass at the Lane Street intersection ramp, which she characterized as "steep." Her husband had to help her traverse that ramp. At Arthur Street, there was grass growing in the ramp. Once she and her companions reached their destination, rain began and lasted for about 20 minutes. When she tried to return to her van, there was standing water that obscured the ramps and the transitions to the asphalt. She was unable to access the ramps without her husband's help. She said that all the ramps on Old US-12 were littered with debris.

Brenda Baraniak lived in Chelsea for seven years. She suffered a spinal cord injury, leaving her paralyzed from the waist down. She uses a manual wheel chair for mobility, and she transfers to a van for transportation.

Ms. Baraniak described her experience in August 2014 when she took her granddaughter to the Chelsea Fair. She parked at a mall across from the Fairgrounds and used the curb ramp to cross Manchester Road at Old US-12. She said the ramp leaned one way and there was a "lip" at

the bottom where the curb ramp met the asphalt. She could not proceed on her own and needed help getting back in the crosswalk. Her daughter had to help her up the ramp on the opposite side of the intersection because of the slant on one side of the ramp. There was water, sand, dirt, and stones on the detectable warning of the ramp and the Silver Maples Road intersection with Old US-12. She identified photographs that depicted the hazards she described in her testimony.

Karen Street testified that she has been paralyzed in her right lower extremity since 1954 when she contracted polio. She tried to walk using two canes, but for longer distances she uses a powered scooter. Ms. Street has lived in Chelsea for 41 years. She frequents a retirement community on Silver Maples Drive. She testified that she cannot use the curb ramp at that intersection with Old US-12 when there is standing water. She described an experience in the summer of 2016 when she encountered difficulty with the curb ramp at Silver Maples Drive; the ramp was full of sand, which accumulated because the ramp slopes toward the center. She found that water stands in the ramps for a considerable time after a rainfall.

Merlyn Street, Karen's husband, testified that he has had limited walking ability since he contracted polio in 1952. He is able to walk about ten feet with assistance. He stated that he would like to cross Old US-12 at Silver Maples Drive if he could. But the conditions there, as described by his wife, prevent him from doing that.

Lee Benton testified that he was paralyzed on the left side of his body from cerebral palsy. He uses a motorized chair for mobility, which he controls with a joy stick using his right hand. The chair weighs 900 pounds. Mr. Benton travels from Ann Arbor using the Way Bus, gets off at Main Street, and works his way down Old US-12. On one occasion, traveling to the Chelsea Fair, he noticed grass and debris at the curb ramp intersections. When it rained, there frequently was

standing water.  The impediments caused him to lose his balance.  If he loses touch with his joy

stick, he has to ask a stranger to help him readjust his body in the chair.  He noted that there was

grass growing on some of the curb ramps, and the cross slopes cause his body to lean to the left.

Sometimes at the Old Manchester Road intersection, he has to go out into the roadway to cross

over.  At the other side of the intersection, the cross slope makes him lean when ascending the

ramp.  And other times when he hits a bump on the ramp transition, his wheels get stuck.

Jennifer Kundak, a 26-year Chelsea resident, has degenerative disc disease with

impingement in her lumbar spine.  She has chronic leg pain, which causes difficulty walking and

she drags her right foot.  She attends the Wellness Center on Old US-12 near the Silver Maples

Drive intersection.  She does not use the curb ramps at the Silver Maples Drive intersection because

debris, gravel, mud, and broken pavement interfere with her walking there.

Deborah L. Clark testified by deposition that she has had multiple sclerosis for more than

30 years, which caused a steady decline of her motor functions so that she now needs to use a

wheelchair all the time to move around.  She also has a van that is modified to accommodate her

wheelchair and which allows her to drive using hand controls.  Clark lives in Grass Lake,

Michigan, and in 2014 she began to attend services at St. Mary's Church in Chelsea, Michigan.

The church is located on Old US-12 within the City, near the intersection with Silver Maples

Street.  Clark began to attend services at St. Mary's to get out of the house and meet people after

her husband died.  The priest at the church told her about events that happen in Chelsea like parades

and the Sights and Sounds fair.

The first time that Clark tried to attend a parade in Chelsea, she parked in the parking lot

of the shopping mall on Old US-12 near the intersection with Manchester Road.  At the curb cut

for that intersection, while crossing US-12 from south to north, Clark was "jolted" in her wheelchair while descending the curb cut to the street. She had a similar "jolting" feeling while using the curb cut at the intersection of Taylor Street. Clark stated that she had similar difficulties with the intersections she used along Old US-12 each time she tried to attend parades in 2014 and 2016. She also stated that at the same intersections with Manchester, Silver Maples, and Taylor streets there are "large potholes that make some of the curb ramps unusable." In addition to the "jolting" sensation she felt when navigating the curb cuts, Clark testified that when she tried to attend a parade in the Summer of 2014, the curb cuts and sidewalks prevented her from getting as far as she wanted to travel along the parade route, and she could not get to a shaded area. Unable to reach any shade, she gave up and left early without seeing the entire parade. The jolting that she experienced when going up or down curb ramps caused Clark's hands to shift on the controls of her electric wheelchair, which made it difficult for her to control her chair and made her feel unsafe.

Carlos Gray-Lion also testified by deposition. He has lived on West Summit Street in Chelsea since 1999. He had a stroke in 2006, causing the loss of full use of the right side of his body. He can walk between 10 and 20 feet using a walker, but for mobility over any longer distance he has to use a wheelchair. When he leaves his home, Gray-Lion always has his caretaker, Joanne Ladio, go with him to push the wheelchair, because it is unmotorized and he cannot move with it on his own.

Gray-Lion testified that he most recently tried to attend the Sights and Sounds fair in Chelsea in 2016, and that, even with his caretaker's help, "in a wheelchair it's almost impossible . . . to maneuver up and down the sidewalks along Old US-12." Gray-Lion said that around the

intersection of Will Johnson Drive and US-12, near Silver Maples, there were "mud puddle[s] galore." He stated that the rain (and, in the winter, snow) made it impossible to navigate the curb ramps for the sidewalks along Old US-12, and that it often would be 24 to 48 hours after a rain before the ramps would dry out and become passable again for a wheelchair.

Marijane Nelson sued on behalf of her minor son, J.N. (age 12). She testified by deposition that J.N. was born with spina bifida and is paralyzed from the waist down. He uses forearm crutches to walk and sometimes uses a manual wheelchair which he moves on his own. J.N. has sometimes walked as far as 400 yards on crutches, but when they go to areas with crowds he is in the wheelchair for his safety. Since 2014 J.N. has participated in a summer race through downtown Chelsea known as Run for the Rolls. Part of the race route covers M-52 going south, then turning onto Old US-12 heading west toward Taylor Street. J.N. most recently participated in the race in August 2016.

Nelson testified that she has to be careful and keep a close watch on J.N. any time he is traveling along sidewalks because the clearance of his feet to the ground in the wheelchair may cause him to get stuck on uneven or sloped surfaces, and sometimes he has gotten a crutch stuck and tripped. Nelson focused on J.N.'s problems navigating the curb ramps at the crosswalk to cross Taylor street while traveling east to west along the north side of US-12, which was part of the route that they used to return to their car after the race. Nelson attested that J.N. had a "tendency" to "clip his toes" or get his crutches caught where there was not a "smooth transition" from the curb ramp to the crosswalk.

The plaintiffs also offered the deposition testimony of Carolyn Grawi, the full-time Executive Director of plaintiff Ann Arbor Center for Independent Living (AACIL). She said that

she also works part-time as an instructor in the School of Social Work at the University of Michigan. Grawi manages all of the business affairs of the AACIL, plans conferences and events, provides services to members who are disabled persons, and supervises a staff of 16 employees. Each year the organization provides services to between 3,500 and 5,000 disabled persons living in Washtenaw County. The AACIL's operations are funded primarily by grants from the State of Michigan and the federal government. The organization's annual budget is $1 million, mostly from government grants, but about $130,000 comes from charitable donations. Grawi is paid a salary of $75,000 per year and works at least 1,980 hours per year as a full-time employee.

Grawi testified that she has not personally had occasion to use any crosswalks along Old US-12, but she had observed on many occasions that numerous sidewalk ramps along the road were inundated with water, including many that she observed during the drive to the location of her deposition on February 7th. Grawi stated that her organization received complaints from members including plaintiffs Shauna Mote, Deborah Clark, and Brenda Baraniak, about difficulties that they had using the sidewalks along Old US-12 in Chelsea. Grawi and the individual plaintiffs as her members "spent quite a bit of time talking about the different areas" that have accessibility problems along US-12. The time Grawi spent considering those problems was time that could not be devoted to other activities of the AACIL, like providing services to members. Grawi also communicated by email and had phone calls with the plaintiffs and members of AACIL's board about the sidewalk issues. Grawi also conferred with plaintiffs' counsel and testified at a deposition in this litigation regarding the problems with the sidewalks along Old US-12. Grawi attested that all of the time that she spent relating to this litigation would have been

spent providing services to members of the AACIL in other ways, if she had not been required to pursue the lawsuit.

B. Old US-12 Intersections
1. Construction Project

Old US-12 is a county road under the exclusive domain of the WCRC. In 2007, the WCRC carried out the "Old U.S. 12 Resurfacing Project," which was referred to in project documents as being undertaken "in cooperation with the Michigan Department of Transportation." The project called for resurfacing Old US-12 with hot asphalt cold milling from 120 feet west of its intersection with Wilkinson Street to 75 feet west of its intersection with State Highway M-52. The project was to include ADA-complaint concrete sidewalk ramps and curb and gutter repair work. The project log stated that the "improvements covered by [it would be] constructed in accordance with the Michigan Department of Transportation 2003 standard specifications for construction," and it included drawings and specifications for, among other things, "sidewalk ramp details," "concrete sidewalks," and "concrete curb[s]." The referenced specifications were found in MDOT Standard R-28-F.

The project log stated that "all sidewalk ramps" within the work zone would be "replaced and/or relocated with ADA compliant ramps." An accompanying letter from WCRC officials stated that the County required a permit to be issued by the City of Chelsea for work to be performed within the City limits, before it could "submit a final engineering package to the Michigan Department of Transportation Local Agency Section." That letter noted that the work would include "reconstruction of the sidewalk drops to become compliant with ADA requirements" at the intersections with Lane Street, Arthur Street, and Old Manchester Road.

Subsequently, the WCRC entered into a contract with MDOT to procure financing for the project from MDOT. The project was financed with federal funds.

The City of Chelsea did not exercise any control over the WCRC's construction activity within the WCRC right-of-way. Christine Linfield, Chelsea's city engineer, testified that there was no statutory authority to do so. However, Chelsea required a permit for any WCRC construction outside the WCRC right-of-way connecting city streets for asphalt cutting, patching, and placement of signs within the city limits. In turn, the WCRC required the City to obtain permits for any construction or maintenance activity within the county right-of-way. WCRC permits require City projects to follow WCRC-approved specifications, and they are subject to inspection by the WCRC upon completion.

## 2. Curb Ramps and Intersections

The curb ramps at issue in this case are two (2) at the intersection of Old US-12 and Wilkinson Street, four (4) at the intersection of Old US-12 and Lane Street, four (4) at the intersection of Old US-12 and Arthur Street, six (6) at the intersection of Old US-12 and Taylor Street/Old Manchester Road, and two at the intersection of Old US-12 and Silver Maples Drive. The WCRC installed the curb ramps along Old US-12 at its intersections with Wilkinson Street, Lane Street, Arthur Street, and Taylor Street/Old Manchester Road. Silver Maples is a retirement community, built in 2002, that has independent and assisted living. The crosswalk on Silver Maples Drive (a private road) north of Old US-12 was put in by Silver Maples as part of its site plan development. The City of Chelsea's Planning Commission required that Silver Maples install sidewalks along Old US-12. The WCRC did not construct the curb ramps at Silver Maples Drive.

As discussed below, and as outlined in the Court's previous opinions in this case, the sidewalks and curb ramps at intersections must comply with certain federal regulations enacted under the ADA and the Rehabilitation Act, known as the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, and the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. Pt. 101-19.6, App. A, respectively. The construction specifications stated in MDOT Standard R-28-F were intended to achieve that end. The MDOT special detail series R-28 are submitted for approval by the Federal Highway Administration and review by the Department of Justice. According to WCRC Senior Project Manager Mark McCulloch, the edition used in 2007 was R-28-F, prepared by MDOT but not yet approved by the Federal authorities.

The plaintiffs and Chelsea contend that the WCRC did not construct the curb ramps at issue in compliance with that standard. The evidence of the curb ramps' conditions came mostly from inspections made during the pretrial discovery phase of the case, and other measurements taken shortly before trial. The WCRC representatives were invited to participate in the inspections but declined. There is no evidence that WCRC representatives took their own measurements as part of their trial preparation or otherwise.

MDOT special detail R-28-F, applicable to the 2007 Old US-12 project, sets forth specific design and construction details for sidewalks, pedestrian ramps down to the curb, placement of detectible warning, and slopes or grades through the curb and onto the gutter pan and across the street. For straight line curb crossings, Section A-A applies; and for curb crossings along a radius, Section B-B applies.

R-28-F Section A-A (straight line) applies to Wilkinson Street, Ramp No. 5, Lane Street, Ramp No. 5, Arthur Street, Ramp No. 5, and Taylor Street Ramps 1 and 2. R-28-F Section B-B (radius) applies to Wilkinson Street, Ramp 4, Lane Street, Ramps 2, 3 and 4, Arthur Street, ramps 2, 3, and 4, Taylor Street ramps 2 and 3, and Old Manchester Road ramps 6 and 7. R-28-F, Sections A-A and B-B, both require a continuation of a downward slope from the 'expansion joint' or 'strip' between the end the single section of concrete forming the ADA pedestrian ramp attached to the traditional sidewalk and the beginning of the single section of concrete forming the curb and gutter pan. The slopes shown on R-28-F, where the curb joins out into the flow line of the gutter pan, creates a trough-like low point, one half of the gutter sloping from the road toward the curb opening, and the other half sloping toward the road from the ramp into the receiving slope inside the curb opening creating a subtle "V." This "V" should be located in front of and outside of the curb line. The purpose of this constant slope away from the ramp ensures the run of water down the ramp over the pedestrian crossing at the curb and then away from the ramp. These required slopes ensure that water running off the road pavement will not traverse beyond the flow line of the gutter and pool back into the pedestrian's curb opening. The required slope inside the curb opening is a minimum of 2% toward the flowline of the gutter.

R-28-F also calls for the placement of drains at various locations proximate to intersections for the removal of standing (and flowing) water. The WCRC did not install any drains along Old US-12 during the 2007 reconstruction project because that task was not included in its funding or bid proposal.

Christine Linfield testified that on May 1, 2018, Chelsea representatives took measurements of the portion of the curb cut base and the gutter pan along the pedestrian crossings

-13-

in the curb cuts slopes from the ramp out toward the street to the flowline of the gutter, as shown in R-28-F Sections A-A and B-B. Measurements were taken at the center of the curb opening and either side at locations where a wheelchair would travel over the gutter. Any dirt and debris present were cleaned down to the bare concrete surface before measurements were taken. A standard four-inch digital level was used to obtain precise readings of this area. The level was properly calibrated, and the resulting measurements were accurate and reliable.

R-28-F, Section A-A, straight-line curb, requires a maximum grade of 8.3% from the "joint" to the "V" and to slope up towards the roadway from the flow line of the gutter adjacent at a slope not to exceed 5.0% grade. R-28-F, Section B-B, radius-line curb, requires a minimum grade of 2% from the "joint" to the "V" of the gutter and then a slope toward the road not to exceed 5.0% grade. Each sheet of R-28-F includes a detail and reference to the note to slopes of 2% "in any direction." All gutter pans measured on May 1, 2018, save one, failed to comply with the slope requirements of R-28-F, Sections A-A and B-B. Curb openings either sloped back toward the ramp, were flat, or were otherwise under the minimum outward slope required by R-28-F. Because of the out-of-compliance condition, water could not travel beyond the base of the ramp "joint," which marks the end of the sidewalk, and into the flow line of the curb to be drained away. Only the Northwest ramp at Taylor Street traveling South (Ramp No. 1) complied with the gutter pan details of R-28-F, Section A-A.

The out-of-compliance grade conditions, coupled with the failure to install drains as prescribed by MDOT special detail R-28-F, has caused the accumulation of standing water at the intersections and the deposition of debris on the curb ramps. For instance, according to Christine Linefield, the entire curb length along Old US-12 was observed to be consistently filled with sand

during the months of March, April, and May 2018. Chelsea Department of Public Works Superintendent Derik Bollinger testified that when the Northwest and Northeast ramps at Arthur Street were inspected thirty days after being cleaned, the Northeast ramp had accumulated a significant amount of sand and dirt along the gutter in the curb opening during that time, while the Northwest ramp was relatively clean. That was due, he said, to Old US-12 running downhill from East to West, causing the Northwest ramp to receive a larger amount of runoff from upstream than the Northeast ramp. On May 1, 2018, the Northeast ramp at Arthur Street was clogged with large amounts of sand and dirt. Chelsea workers had cleaned the ramp eleven days earlier, during the City's preliminary investigation of the gutter plan slope. Bollinger testified that staining exposed upon removal of dirt and debris indicates that water and debris are traveling back into the ramp rather than out into the flow line of the gutter pan. He said that such debris accumulation and staining does not occur on curb ramps elsewhere within the City, such as those along M-52.

According to Linefield and McCulloch, rainwater will not pool at the base of a curb ramp that is constructed in accordance with MDOT R-28-F. Rainwater from the roadway carries sand and debris from the Old US-12 roadway and then pools at the base of the ramps, causing deposits of sand and debris to accumulate in the gutter pan at the pedestrian crossings. McCulloch observed water pooling at the base of the Arthur Street ramp for at least six (6) hours. He thought an obstruction on the adjoining city street was the culprit. But when DPW Superintendent Bollinger inspected the location after a WCRC Engineer's visit to the site, he found no obstruction on the connecting city street.

Bollinger also observed the Northwest and Northeast ramps at Arthur Street in late February 2018 shortly after a rain event. He said that the ramps pooled water and were clogged

with a significant amount of sand, dirt and debris. Bollinger and Linefield visited the Northwest and Northeast ramps at Arthur Street in late March 2018 and took photographs, which depicted the ramps prior to cleaning, after cleaning by a street sweeper, and after being manually cleaned. Before cleaning, the ramps were clogged with a significant amount of sand, dirt and debris at the base of the ramp openings along the gutter pan. Bollinger testified that these accumulations came from the sand thrown onto the roadway by WCRC during winter maintenance and washed down the curb flow lines and into the ramps.

The WCRC-constructed curb ramps collect water and frequently are filled with dirt, sand and debris. Many of the installed gutter pans are graded back toward the ramp, causing the low point of the gutter to fall behind the curb and fill with water. R-28-F requires the gutter pan to slope away from the ramps, thereby allowing water to flow beyond the curb into the flow line of the gutter where water will flow away from the ramp. Water could not pond or deposit debris if a ramp is built according to the applicable MDOT R-28-F standard.

Chelsea used an Elgin Whirlwind mechanical street sweeper that has a belly sweeper for the road surface, and a gutter broom that pulls material into a suction nozzle to vacuum up and haul away dirt and debris. Bollinger testified that the street sweeper could not fully clean the Northwest and Northeast ramps at Arthur Street. He explained that the mechanical street sweeper is not designed to clean up and into curb ramp openings in the curb; it only sweeps along the gutter pan. The dirt and debris were so thick that the mechanical sweeper could not sweep and suction the debris away in even two passes. That condition was unusual and not replicated on any other ramps thorough within the City. After being cleaned with the mechanical sweeper, City

maintenance staff manually cleaned the ramps with a flat shovel and push broom. The debris was pushed into the street where it could be reached by the mechanical sweeper and hauled away.

The WCRC maintains that its construction of the curb ramps was fully compliant with R-28-F, and therefore with the ADAAG and the UFAS. In support, it argues that the project had to pass inspection for ADA compliance before any funds would be released to pay contractors and reimburse the County for constructions expenses. And it contends that any out-of-compliance measurements found later, including the April and May 2018 measurements, were the result of settling and shifting of the concrete curb ramps in relation to the asphalt road surface.

The evidence does not support those arguments.

First, there is no conclusive evidence that the ramps were constructed in accordance with the R-28-F specifications. The MDOT required form 1120, known as a "Final Inspection and Acceptance," to be completed at the end of each MDOT-related project. The WCRC did not submit a copy of the MDOT form 1120 for the 2007 Old US-12 project. Sheryl Siddall, its Director of Engineering, explained that it had purged its records. Nor did the WCRC produce any witness who had knowledge of the contents, entries, completion, or filing of a form 1120 for this project.

In addition, the MDOT required "Inspector Daily Reports," known as IDRs, to be completed by the project inspector on a daily basis on MDOT form 1122B. Ms. Siddall was familiar with IDRs; she confirmed that IDRs require the memorialization of only area calculations and materials used for payment purposes, not details as to ADA compliant construction. Neither she nor any other WCRC witness knew if ADA compliance details or inspections were actually written on the subject daily IRD forms. The Project Inspector for the 2007 Old US-12 project was Paul Heinrich. To confirm that the 2007 construction of the curb ramp slopes were completed

correctly, the WCRC inspector would have had to be on site at the time of the original pour of the concrete, and would have had to measure the slopes as constructed. Mr. Heinrich was the inspector, but there is no evidence that he actually made such measurements, or if he did, that he noted the measurements on the IDRs for each day and filed them at the WCRC main office. Mr. Heinrich was retired at the time of trial, but he resided in Washtenaw County, Michigan, and was in occasional contact with WCRC personnel, including within six weeks before trial. No party produced Mr. Heinrich as a witness. The WCRC did not produce a witness that knew whether or not ADA compliance measurements were included on any IDR. No witness testified with personal knowledge that the 2007 curb ramps and gutters were ADA compliant at the time of installation.

All municipal project files are subject to possible audit by the MDOT after the completion of a project. However, neither the 2007 Old US-12 reconstruction project nor a similar WCRC road improvement project in 2016 were audited. Chelsea did not inspect the WCRC's work. It did not receive an MDOT Form 1120 Final Inspection report. The WCRC did not provide the City with its IDRs or any other information of measurements of the curb ramps. There is no direct evidence that the curb ramps were ADA-compliant when constructed. And there is no evidentiary support for the WCRC's circumstantial argument that payment would not have been approved if the records had not demonstrated compliance.

Second, there is no evidence to support the WCRC's theory that pavement shifting over time caused the out-of-compliance measurements found in 2017 and 2018. For instance, the Northwest and Northeast ramps at Arthur Street do not exhibit any signs of heaving, buckling, cracking, or settling in 2018. All flags of concrete were flush, and joints between ramp, curb, and gutter pan were flush and even. Shifting concrete is easily identifiable by visible cracking,

distortion of joints, and changes in elevation resulting in uneven abutting slabs. None were observed at the curb ramps in the intersections at issue here.

Moreover, as of May 2018, none of the ramps showed signs of deterioration. All concrete slabs were level and abutting one to the other, and level with abutting curbs and abutting gutters in every instance. The expansion joints between slabs, gutters and curbs were evenly spaced and uniform. Bollinger testified that shifted concrete is easily identifiable by visible cracking, distortion of joints, and changes in elevation resulting in uneven abutting slabs. But there was no heaving, shifting, buckling, cracking or settling observed by any witness that would indicate that the ramp slopes exist in a different state today than they did in 2007. The City witnesses reasonably inferred that the condition of the ramps has not changed since 2007 and that the inter-curb slopes found were those as the ramps had been constructed. Mr. McCulloch of the WCRC could not recall changes in elevation or uneven abutting slabs. He did not measure slopes on his April 2018 inspection of the one set of crossings he did look at.

There has been no showing of an intervening cause that the several abutting, disconnected, separately poured sections of flat and sloped concrete, curbs and gutters all settled, heaved, or otherwise shifted simultaneously in identical proportion creating the illusion of solid original construction. The WCRC did not present a witness having personal knowledge of the curb ramps having been in any different condition or having personal knowledge that the ramps were ADA-compliant when installed.

Chelsea has not altered or otherwise manipulated the structure of the curb ramps installed by WCRC in 2007 under permit or otherwise.

It is more likely than not, therefore, that the WCRC failed to comply with the requirements of MDOT specification R-28-F when in 2007 it constructed the curb ramps at the intersection of Old US-12 and Wilkinson Street, the intersection of Old US-12 and Lane Street, the intersection of Old US-12 and Arthur Street, and the intersection of Old US-12 and Taylor Street/Old Manchester Road.

Finally, the WCRC has created an ongoing condition by throwing sand onto the roads and gutters along Old US-12 throughout the winter months. The sand regularly washes along the gutters and into the ramps by rainwater and snow melt. The WCRC does not sweep Old US-12 or remove the sand deposited by it. Chelsea does not spread sand on its streets or on M-52, which it maintains under contract with MDOT.

## II. Evidentiary Issues

The WCRC contests the admissibility of the Grawi and Clark depositions. The plaintiffs offered those under Federal Rule of Civil Procedure 32(a)(4)(B) (allowing use at trial when "the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition") and Federal Rule of Evidence 804(b)(1) (former testimony of an unavailable witness). Plaintiffs' counsel represented at trial that both witnesses were not in Michigan at the time of trial, and all parties had an opportunity to examine them at their discovery depositions.

Counsel for the WCRC took Grawi's deposition in another lawsuit after the trial proofs in this case were concluded. Grawi testified there that she moved to Florida in January 2018 and was no longer employed by AACIL. She acknowledged that she returned to Michigan from time to time for personal and business reasons. However, she was not in the state in late May and early

June 2018 when the trial in this case was held. She testified, though, that plaintiffs' counsel told her that she would not be required to return to Michigan for the adjourned trial date, since she did not have other business in the state at the time. She stated that coming to trial then might have caused her difficulty if she could not get time off work, and she would have to bear the travel expense. Counsel for the WCRC then filed a motion to strike Grawi's deposition testimony, but he disregarded the requirement of E.D. Mich. LR 7.1(a), which requires that he confer with his counterpart before filing such a motion.

The refusal of WCRC counsel to make any effort to comply with the local rule is disturbing, betrays a fundamental misunderstanding of the meet-and-confer requirement of LR 7.1, and would justify dismissal of the motion, even if it had merit. It is apparent from the filings, however, that plaintiffs' counsel did not "procure" Grawi's absence from trial. He had arranged for her to be present for trial when it was originally scheduled for April 30, 2018. At the final pretrial conference held on April 25, the Court adjourned the trial to May 29, 2018. Plaintiffs' counsel asserted in his response to the WCRC's motion that he in fact told Grawi that she did not have to show up at trial on April 30, because the trial had been adjourned. Nor can it be said that plaintiffs' counsel engaged in willful misconduct or that he caused Grawi not to attend the trial in person. She moved to Florida on her own and was beyond the geographic subpoena authority of the Court. *See* Fed. R. Civ. P. 45(c)(1)(A) (authorizing a Court to issue a subpoena to command the appearance of a witness at trial "within 100 miles of where the person resides, is employed, or regularly transacts business in person"). The essence of defense counsel's accusation is that plaintiffs' counsel apparently told Grawi (correctly) that she did not have to honor a subpoena that required her to appear for a trial being held more than 100 miles from where she then lived. *See*

*K.S. v. Detroit Pub. Sch.*, No. 14-12214, 2015 WL 6671560, at *1 (E.D. Mich. Nov. 2, 2015) (citing *United States ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 444 F.3d 462, 468 (6th Cir. 2006)). No misconduct occurred by conveying that advice. Rule 32(a)(4)(B) authorizes the use of Grawi's deposition at trial. The WCRC's motion to strike that testimony will be denied.

Deborah Clark encountered similar circumstances. She was prepared to testify in person at the April 30 trial. However, she was committed to travel plans, which overlapped with the adjourned trial date on May 29. She was 2,000 miles from the courthouse, and therefore was unavailable. There is no evidence that Clark manipulated her travels to avoid appearing at trial, or that her "absence was procured by the party offering the deposition." Fed. R. Civ. P. 32(a)(4)(B). Her testimony by deposition is allowed.

The WCRC also objected to testimony and exhibits that pertained to measurements of the curb ramps taken in early May 2018 shortly before trial. The basis of the objection was that Chelsea and the plaintiffs did not disclose that evidence under the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(1). The Court granted the WCRC's motion to exclude evidence of measurements taken on March 22, 2017, as they duplicated earlier measurements made in 2016. However, as part of their trial preparation, representatives of Chelsea and the plaintiffs returned to the scene and took measurements of different parts of the gutter pans and curb ramps at the subject intersections. The attorneys for the WCRC were notified in advance, but they refused to participate. The evidence was offered at trial through Derik Bollinger's testimony on a separate record.

Rule 26(a)(1) governs initial disclosures at the commencement of a lawsuit and requires each party, "without awaiting a discovery request," to inform opposite parties "of each individual

-22-

likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses"; furnish all documents "and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses"; and to disclose damages calculations and insurance information. Fed. R. Civ. P. 26(a)(1)(A)(i)-)iv). After a party makes its initial disclosures it has a continuing duty seasonably to supplement them "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ P. 26(e)(1)(A).

It has been said that the purpose of Rule 26 is to prevent "trial by ambush," permitting opposing counsel sufficient information to allow cross-examine with advance preparation. *See Mccaulay v. Anas*, 321 F.3d 45, 50, 52 (1st Cir. 2003). The initial disclosure requirements "are designed to accelerate the exchange of basic information and help focus the discovery that is needed, and facilitate preparation for trial or settlement." *Poitra v. Sch. Dist. No. 1 in the Cty. of Denver*, 311 F.R.D. 659, 663 (D. Colo. 2015) (internal quotation marks, citations, and brackets omitted). The rule was never intended, however, to inhibit a party's ability for trial preparation. In fact, a separate section of Rule 26 actually limits discovery of trial preparation materials. *See* Fed. R. Civ P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent".).

The information gathered during the scene visit of May 1, 2018 did not fall within any of the Rule 26(a)(1)(A) categories, and the non-disclosure did not trigger any preclusion or other sanction found in Rule 37(c)(1). The WCRC has not pointed to any other discovery demand that would have required supplementation with the data gathered on May 1. The measurement activity

amounted to trial preparation, just like witness interviews and preparation of exhibits.  Closure of formal  discovery under a case management order entered under Rule 16 does not signal the end of additional investigation or evidence gathering in any case.

There was no obligation here to share trial preparation material.  Nonetheless, the WCRC was informed of the activity in advance and chose to ignore the opportunity, apparently relying on the misguide notion that late-gathered information could be excluded from evidence.  But the discovery rules have never encouraged such a head-in-sand approach to litigation.  And the measurements of the curb ramps on a public street were there for all to see, even counsel for the WCRC, should he have chosen to bring his engineers to the site on May 1 or any other day.  There is no basis to exclude evidence of the measurements and curb ramp conditions observed on May 1, 2018.

### III.  Conclusions of Law
#### A.  Statutory Provisions
##### 1.  The ADA and its Regulations

Title II of the ADA prohibits the exclusion of a "qualified individual with a disability" from "participation in" or enjoying the "benefits of the services, programs, or activities of a public entity."  42 U.S.C. § 12132.  It also prohibits "discrimination by any such entity."  *Ibid.*

A "qualified individual with a disability" within the meaning of the ADA is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, [or] the removal of architectural . . .  barriers . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  All of the individual plaintiffs fit within this definition.  They all suffer from a disability that affects their mobility, and they all sought — and continue to seek — to use the

sidewalk facilities within the City of Chelsea. Curb ramps constructed to conform with the ADAAG and UFAS amount to reasonable accommodations.

"'Public entity' includes 'any state or local government' and 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004) (quoting 42 U.S.C. § 12131(1)(A) & (B)). The City of Chelsea and the Washtenaw County Road Commission are "public entities."

Through section 204 of the ADA, Congress granted to the Attorney General the "authority to promulgate regulations to implement its provisions." *Ibid.* (citing 42 U.S.C. § 12134). One of those regulations, 28 C.F.R. § 35.151, governs construction and alteration of public facilities commenced after January 26, 1992. When the alteration "could affect the usability of the facility," the alterations must be designed and constructed "in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities.'" *Ibid.* (quoting 28 C.F.R. § 35.151(b)). The regulations define the term "facility" to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104. The sidewalks and curb ramps along the relevant portion of Old US-12 are "facilities" within the meaning of the regulations.

As the Court explained in its previous opinion in this case, "'To be "readily accessible," any part of a newly constructed or altered facility must be constructed in conformance with the ADAAG, 28 C.F.R. Pt. 36, App. A, or with the UFAS, 41 C.F.R. Pt. 101-19.6, App. A.'" *Mote v. City of Chelsea*, 252 F. Supp. 3d 642, 649 (E.D. Mich. 2017) (citing *Daubert v. Lindsay Unified*

*Sch. Dist.*, 760 F.3d 982, 986 (9th Cir. 2014); 28 C.F.R. § 35.151(c)(1)-(3)). The ADAAG is a set of regulations that set out, in comprehensive detail, the design specifics for structures and facilities to make them "readily accessible" to disabled persons. The regulations also require a public entity to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R. § 35.133.

With respect to curb ramps, section 35.151(i) expressly requires that "(1) Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and "(2) Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." 28 C.F.R. § 35.151(i). The DOJ has interpreted this regulation to require that "[w]hen streets, roads, or highways are newly built or altered, they must have ramps or sloped areas wherever there are curbs or other barriers to entry from a sidewalk or path. Likewise, when new sidewalks or paths are built or are altered, they must contain curb ramps or sloped areas wherever they intersect with streets, roads, or highways." U.S. DOJ, ADA Title II Technical Assistance Manual II-6.6000 (https://www.ada.gov/taman2.html).

The ADAAG sets forth detailed specifications for the location and construction of curb ramps in Section 4.7 of the Guidelines (1991 version). As an initial matter, the Guidelines define the term "accessible route" as "[a] continuous unobstructed path connecting all accessible elements and spaces of a building or facility." ADAAG 3.4. "Exterior accessible routes may include parking access aisles, curb ramps, crosswalks at vehicular ways, walks, ramps, and lifts." *Ibid.*

The phrase "curb ramp" refers to "[a] short ramp cutting through a curb or built up to it." *Ibid.* "If an accessible route has changes in level greater than ½ in (13 mm), then a curb ramp . . . shall be provided that complies with [ADAAG 4.7]." ADAAG 4.3.8. "Curb ramps complying with [ADAAG 4.7] shall be provided wherever an accessible route crosses a curb." ADAAG 4.7.1.

"Slopes of curb ramps shall comply with [ADAAG 4.8.2]." ADAAG 4.7.2. Section 4.8.2 specifies that "[t]he least possible slope shall be used for any ramp," "[t]he maximum slope of a ramp in new construction shall be 1:12," and "[t]he maximum rise for any run shall be 30 [inches]." ADAAG 4.8.2. "Transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes," and "[m]aximum slopes of adjoining gutters, road surface immediately adjacent to the curb ramp, or accessible route shall not exceed 1:20." *Ibid.* "The minimum width of a curb ramp shall be 36 [inches], exclusive of flared sides." ADAAG 4.7.3. "Surfaces of curb ramps shall comply with [section] 4.5." ADAAG 4.7.4. Section 4.5 covers "ground and floor surfaces" generally and states, among other things, that (1) "[g]round and floor surfaces along accessible routes and in accessible rooms and spaces including floors, walks, ramps, stairs, and curb ramps, shall be stable, firm, [and] slip-resistant"; (2) changes in level less than ¼" may be "vertical and without treatment"; and (3) changes between ¼ and ½" must be beveled and with a slope no greater than 1:2. ADAAG 4.5.1-4.5.2.

Curb ramps must "be located or protected to prevent their obstruction by parked vehicles," and ramps "at marked crossings shall be wholly contained within the markings, excluding any flared sides." ADAAG 4.7.8-4.7.9. "Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces." ADAAG 4.8.8.

### 2. The Rehabilitation Act

Section 504 of the Rehabilitation Act parallels the command of the ADA concerning accessibility to public facilities for persons with disabilities, but it applies only to "any program or activity receiving Federal financial assistance.'" *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (quoting 29 U.S.C. § 794(a)). "[T]he remedies, procedures, and rights available under Title II of the ADA parallel those available under [The Rehabilitation Act]." *Ability Center*, 385 F.3d at 905 & n.7 (citing 29 U.S.C. 794a(a)(2); *Barnes v. Gorman*, 536 U.S. 181, 189 n.3 (2002); *Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998)). Thus, the Sixth Circuit has explained that its "analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are 'quite similar in purpose and scope.'" *Babcock*, 812 F.3d at 540 (quoting *McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453, 459-60 (6th Cir. 1997)).

The regulations enacted under the Rehabilitation Act apply "to each recipient of Federal financial assistance from the Department of Transportation and to each program or activity that receives such assistance," and require that "all [] entities subject to section 504 shall design, construct, or alter buildings, or other fixed facilities, in conformance with appendices B and D of 36 C.F.R. part 1191, as modified by appendix A to part 37 of this title." 49 C.F.R. § 27.3. "The Rehabilitation Act has a set of standards nearly identical to the ADAAG called the Uniform Federal Accessibility Standards ('UFAS'). 41 C.F.R. pt. 101-19.6, app. A." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291 n.2 (5th Cir. 2012). The WCRC is subject to both the ADAAG and the UFAS with respect to the 2007 renovation project for Old US-12.

### 3.  State Law

The state law counterpart to these two federal statutory mandates is the Michigan Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101, *et seq.*  That enactment "'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'"  *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)).

### B.  Standing

The WCRC argues that the plaintiffs lack standing to pursue their claims for injunctive and declaratory relief because they have not suffered an injury in fact, and they have not shown that any accessibility deficit is fairly traceable to the WCRC.

The requirement of standing comes from Article III's limitation on the judicial power of federal courts to adjudicate only actual cases and controversies.  It seeks to ensure the plaintiff has a "personal stake in the outcome of the controversy" at the outset of litigation.  *Baker v. Carr*, 369 U.S. 186, 204 (1962).

To establish standing, a plaintiff must show that he or she has suffered an "injury in fact," that was caused by the defendant's conduct, and that a favorable decision will redress that injury.  *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, --- F.3d ---, No. 18-1896, 2019 WL 2417390, at *2 (6th Cir. June 10, 2019) (citing *Nikolao v. Lyon*, 875 F.3d 310, 315-16 (6th Cir. 2017); s*ee also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The first requirement requires proof of "an injury in

fact, which is 'concrete, particularized, and actual or imminent.'" *Id.* art *3 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). For a plaintiff seeking injunctive or declaratory relief, the mere occurrence of past harm will not do. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983). "When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). "Past exposure to illegal conduct" will suffice to demonstrate an injury in fact that warrants declaratory or injunctive relief when the past injury is accompanied by "continuing, present adverse effects." *Sullivan v. Benningfield*, 920 F.3d 401, 407–08 (6th Cir. 2019) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)).

The individual plaintiffs have satisfied these requirements. They have described the accessibility barriers at the subject intersections caused by the standing water and accumulated debris found regularly on the curb ramps. Those conditions were persistent and caused by construction that did not comply with the ADAAG and UFAS. The WCRC neither graded the curb ramps properly nor installed the drainage recommended by MDOT specification R-28-F, nearly guaranteeing that water will accumulate whenever there is more than moderate rainfall. There is a significant possibility of future harm, which was caused by the faulty construction, and ordering compliance likely will redress the injury.

The question of AACIL's standing was addressed in a prior opinion iled in this case. *See Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 886-88 (E.D. Mich. 2018) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an advocacy organization for the

homeless had standing to proceed against the defendants in a discrimination action, where its complaint alleged that the organization had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," and that the organization "had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices")).

## C. Failure of Compliance

The command of the governing statutes in this case is clear: public entities must construct their facilities so that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Moreover, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a). Because the improvements to Old US-12 occurred after 1996, the WCRC was required to design and construct the curb ramps so that they would be "'readily accessible and usable by individuals with disabilities.'" *Ability Center of Greater Toledo*, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b)). Michigan's PWDCRA contains similar requirements.

The regulations, discussed above, prescribe detailed specifications to ensure proper grades and slopes that strike a balance between ease of use by wheelchair-bound individuals and the proper flow of water to allow adequate drainage. Curb ramps must be designed and constructed to prevent the accumulation of water. ADAAG 4.6.1, 45.10. The plaintiffs have shown by a preponderance of the evidence that the WCRC's construction of nearly all of the curb ramps at the

intersection of Old US-12 and Wilkinson Street, the intersection of Old US-12 and Lane Street, the intersection of Old US-12 and Arthur Street, and the intersection of Old US-12 and Taylor Street/Old Manchester Road failed to comply with those regulations.

The testimony established that the curb ramps are constructed of several separately-poured concrete components. The concrete curb and gutter is poured first and allowed to cure for three days. The ramp is then built upward from the curb to the sidewalk, and the sidewalk is built from there onward. According to both Mr. Bollinger and Mr. McCulloch, the gutter pan and curb can be removed independently and re-poured to cure defects in design and installation. Bollinger testified that this procedure actually has been done by the WCRC on at least one occasion.

Whether that approach will be sufficient to cause compliance in this case is not clear from the record. The MDOT specification R-28-F calls for the placement of drains proximate to the curb ramps to allow for proper drainage. There is insufficient evidence in this record to conclude that drain placement is necessary to bring the curb ramps into compliance with the ADAAG and UFAS. WCRC engineer Mark McCulloch explained that adding drains would increase costs and was not in the scope of the project. However, for renovations constructed after 1992, "the regulations require compliance with specific architectural accessibility standards." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). Cost certainly is a valid consideration when a public entity is considering an improvement to a facility, but once a decision is made to pursue the project, it is not a defense to violation of the ADA. *See* 28 C.F.R. 35.151(b); *Kinney v Yerusalim*, 9 F.3d 1067, 1074-75 (3rd Cir. 2003) (holding that "once the City undertakes to resurface a street, the accompanying curbs are no longer to be considered as existing facilities, subject to the 'undue burden' defense of § 35.150(a)(3)").

The WCRC must rework the offending curb ramps to improve drainage and to eliminate the incidence of standing water and the deposits of debris on the curb ramps. If replacing the curb ramps solves the problem, compliance likely would be achieved. If not, then installation of additional drainage may be required.

Some of the plaintiffs also complained about the conditions of the curb ramps at Silver Maples Drive and Old US-12. The WCRC did not construct those curb ramps and has no liability for their conditions. Chelsea was responsible for the construction of the ramps at that intersection, but the plaintiffs have offered no evidence that the ramps do not comply with the ADAAG or the UFAS. They only offer anecdotal evidence of the conditions of the curb ramps following a heavy rain. And they submitted a photograph in evidence showing a pothole in the intersection, which Chelsea says was repaired by trial time. They have not sustained their burden against either defendant as to that intersection for prospective relief.

Finally, the plaintiffs argue that Chelsea is liable for the defectively-constructed curb ramps along Old US-12 because it issues permits for work the WCRC performed in the City's right-of-way. It is true that the ADA regulations impose obligations on a public entity to ensure that accessibility features are incorporated and that the ADAAG specifications are complied with any time that a public facility is altered or newly constructed, after 1992, "'*by, on behalf of, or for the use of a public entity* in a manner that affects or could affect the usability of the facility or part of the facility'" *Ability Center*, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b)) (emphasis added). The "project log" and the letter regarding the permit process suggest that the City was involved at the very least in issuing required permits to allow the project to proceed. However, Chelsea had no inspection obligation concerning the project, and the WCRC never furnished Chelsea with any

of its IDRs or the Form 1120 Final Inspection Report. The plaintiffs have not sustained their burden of proving that Chelsea is jointly liable with the WCRC for any resulting ADA defects in the sidewalks and curb ramps.

### D. Construction Versus Maintenance

Chelsea and the WCRC point fingers at each other, alleging fault for the inaccessible conditions of the curb ramps along the stretch of Old US-12 altered during the 2007 resurfacing project. Citing a state law that assigns to the City the responsibility of maintaining sidewalks within its borders, Mich. Comp. Laws Ann. § 691.1402a(1) ("A municipal corporation in which a sidewalk is installed adjacent to a municipal, county, or state highway shall maintain the sidewalk in reasonable repair."), the WCRC argues that the water accumulation and debris collection is purely a maintenance issue. Chelsea says that the water and debris collect on the ramps precisely because of the faulty construction, and no maintenance will cure the problem long-term. The plaintiffs have reached a settlement with the City of Chelsea over the conditions of other sidewalks, curb ramps, and parking facilities within the City; but the plaintiffs argue that the defendants should be jointly liable under the ADA, the Rehabilitation Act, and state law for the curb ramps along Old US-12.

The pertinent provision of the ADAAG and other regulations governing curb ramps states simply that "[s]urfaces of curb ramps shall comply with 4.5." ADAAG § 4.7.4. As noted above, Section 4.5 covers ground and "floor surfaces," and generally requires that "curb ramps[] shall be stable, firm, [and] slip-resistant.". ADAAG § 4.5.1. It also includes design specifications. *Id.* § 4.5.2. There are other pertinent regulations, but they speak to design and construction, not maintenance. *E.g.*, *Id.* § 4.8.8 ("Outdoor ramps and their approaches shall be designed so that

water will not accumulate on walking surfaces."). The regulations do not refer to maintenance specifically.

Certainly, though, if a surface was constructed to be "slip-resistant," but the presence of debris defeats the slip-resistant construction features, which could be restored if the debris were removed, an obligation to maintain accessibility might be triggered. However, no amount of cleaning, or even water and debris removing, can make a ramp compliant with the guideline that requires it to not accumulate water in the first instance. Therefore, there also is a separate obligation to fix the ramp so there is no accumulation. No amount of maintenance can cure the underlying compliance violation, where the ramps were out of compliance as built initially, and no amount of "sweeping up" can restore them to compliance with respect to the basic construction defect. Any maintenance lapse does not absolve the WCRC of its primary liability.

The plaintiffs have not cited any regulations under any of the applicable statutes that might address an obligation to remove debris left behind after the standing water evaporates. The cases on point hold generally that a merely temporary accumulation of debris on a surface is *not* an ADA violation, even if accessibility is impaired. There is no clear definition of a "temporary" obstruction, and the cases are fact-specific.

It is generally acknowledged that "[a] sidewalk is a 'facility,' and sidewalks built or altered after January 26, 1992, must be 'readily accessible to and useable' by people with disabilities." *Straw v. Village of Streamwood*, 734 F. App'x 344, 347 (7th Cir. 2018), *reh'g denied* (June 5, 2018) (quoting 28 C.F.R. §§ 35.104, 35.151). The responsible public entity "*must maintain* [accessibility features] in operative condition, it must repair [them] promptly [if they] malfunction[], and it must take reasonable steps to accommodate an individual who otherwise

would have used the [features] when [they] are out of order." *Foley v. City of Lafayette*, 359 F.3d 925, 929 (7th Cir. 2004). "But the [regulations under the ADA and Rehabilitation Act do] not subject [municipalities] to liability for isolated or temporary interruptions in service due to repairs." *Ibid.*

"[T]here are no universal definitions in the regulations for what is required to 'maintain in operative condition' the accessibility features, to repair 'promptly' such features, or to take 'reasonable steps' to accommodate when the features are not accessible. The extent of inaccessibility covered by the terms 'isolated or temporary' . . . is likewise unclear and only determinable by considering the unique circumstances of the case." *Ibid.* In *Foley*, the court held that a merely temporary accumulation of debris such as dirt, ice, or snow is not sufficient to trigger liability under the ADA or Rehabilitation Act, even where the responsible entity was notified of a problem that impaired accessiblity and had ample time to act. *Foley*, 359 F.3d at 930 ("[E]ven assuming, as we must, that the ramp was impassable, that . . . was a temporary condition. The snowfall covered the sizeable exterior area of Riehle Plaza for which Taylor was responsible for snow removal. That Taylor had four-and-a-half hours notice that Robert was arriving but had not yet cleared the ramp by the time Robert's train arrived does not vitiate the temporary nature of the snow obstruction of the alternative accommodation — and the ADA was not violated."). But if the record shows that there was "frequent denial of access to disabled persons or a policy that neglects [accessibility feature] maintenance," where the responsible entity makes no attempt to offer reasonable accommodations to disabled users during periods of inaccessibility, then the defendant may be liable for neglect of its maintenance obligation. *Id.* at 929.

In this case, the undisputed facts establish that Chelsea does not spread sand on its own streets, nor does it maintain Old-US-12 as it does not receive any funding for such activity, and does not have a maintenance contract with the WCRC. Chelsea's Department of Public Works maintenance procedures provide that after a complaint is received by the City offices, a work order is produced and maintenance staff address the complaint. No party has contradicted Chelsea's assertion that it had never received any complaint about the curb ramps at issue until this lawsuit was filed. Therefore, the plaintiffs have not carried their burden of showing that Chelsea "frequent[ly] deni[ed] access to disabled persons" or that it maintained "a policy that neglects maintenance" of the curb ramps to make them accessible to persons with disabilities.

## IV. Conclusion

The plaintiffs have standing to proceed with their claims for prospective relief against the defendants under the Americans With Disabilities Act, the Rehabilitation Act, and Michigan's Persons With Disabilities Civil Rights Act. The deposition testimony offered by the plaintiffs at trial is properly received in evidence. The evidence of the gutter pan and curb ramp measurements taken in May 2018 are properly received in evidence. The Washtenaw County Road Commission failed to construct the gutter pans and curb ramps in compliance with applicable regulations and specifications promulgated under the ADA and the Rehabilitation Act at the following intersections of Chelsea city streets with Old US-12: two (2) at Wilkinson Street, four (4) at Lane Street, four (4) at Arthur Street, and six (6) at Taylor Street/Old Manchester Road. The City of Chelsea is not liable for the conditions of the intersection crosswalks (including curb ramps) along Old US-12 within its city limits.

For the reasons stated, the Court will enter judgment for injunctive and declaratory relief in favor of the plaintiffs and against defendant Washtenaw County Road Commission on Counts I and II of the second amended complaint. The Court will enter judgment in favor of defendants City of Chelsea and the Chelsea Downtown Development Authority and against the plaintiffs on Counts I, II, and III of the second amended complaint. Except as to the claims addressed by the consent judgment entered between the plaintiffs and the City of Chelsea and its Downtown Development Authority, the second amended complaint will be dismissed with prejudice as to defendants City of Chelsea and the Chelsea Downtown Development Authority. The third-party complaint seeking indemnity from the Washtenaw County Road Commission for any liability imposed upon defendant City of Chelsea for violations of the ADA and the Rehabilitation Act will be dismissed as moot.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: July 3, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on July 3, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI